[Nos. F031253, F031704. Fifth Dist. Feb. 2, 2001.]

ROSIE M. THOMPSON, Plaintiff and Respondent, v.
TRACOR FLIGHT SYSTEMS, INC., Defendant and Appellant.

**COUNSEL**

O'Melveny & Myers, Douglas E. Dexter, Debra L. Boyd, Ammu R. Kirtane; Law Offices of Terence J. Werdel & Associates and Kelly A. Lazerson for Defendant and Appellant.

Law Offices of Michael T. Whittington and Michael T. Whittington for Plaintiff and Respondent.

**OPINION**

**VARTABEDIAN, Acting P. J.**—This is an appeal by Tracor Flight Systems, Inc., the defendant below, after judgment was entered against it in an action for wrongful termination of employment. We affirm the judgment.

### FACTS

We view the evidence in the light most favorable to the party who prevailed in the trial court, resolving in that party's favor all issues of credibility and all inferences from the evidence presented. (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660 [190 Cal.Rptr. 355, 660 P.2d 813].)

In 1992, plaintiff and respondent Rosie M. Thompson was the director of human resources for the Mojave facility of defendant and appellant Tracor Flight Systems, Inc. As such, respondent was responsible for implementing personnel decisions at the facility. She hired new employees when requested by other members of management, terminated and disciplined employees when directed to do so, and maintained personnel records of employees. In addition, she was the person primarily responsible for the Mojave facility's

compliance with appellant's equal opportunity requirements as an employer and as a contractor with the federal government. In 1992, respondent acted as appellant's primary contact for an employment practices audit of the Mojave facility conducted by the United States Department of Labor.

Appellant was a subsidiary of Tracor, Inc. Appellant's corporate headquarters was in Austin, Texas, as were corporate offices of the parent company. At various times relevant to the present case, respondent reported directly to either the general manager of the Mojave facility or a corporate official in Austin. In addition, respondent at all times had the authority to consult with the human resources staff of the parent company. At various relevant times, the parent company was reorganizing or trying to develop uniform human resources standards and practices throughout the extended organization; as a result, respondent at times worked more closely with the Austin human resources staff than otherwise.

In May or June of 1994, Donald Sullivan became general manager of the Mojave facility. During his tenure as general manager in Mojave, Sullivan "yelled and screamed" at respondent and other employees. Sullivan, by all accounts, had a blunt, no-nonsense management style, particularly when he was trying to overcome impediments to the accomplishment of his program goals for the company. He was known to have grabbed a male manager by the shirt in an effort to remove him from a staff meeting. Respondent acknowledged that from the beginning she did not like Sullivan's management style. For his part, Sullivan had complained even before he became general manager that respondent was "stirring the pot" by reporting unnecessary information to Austin.

After Sullivan became general manager, there were several instances in which respondent thought Sullivan's actions presented a potential for employment-related suits against the company. Respondent testified specifically about five such instances.

First, around the beginning of July 1994, an employee—respondent's sister—was scheduled to take maternity leave. The sister worked in the quality assurance department. Her local supervisor followed a chain of command leading to a quality assurance director in Austin, not to Sullivan. Respondent received a personnel request for a temporary employee to replace her sister during the maternity leave. Respondent telephoned the quality assurance director in Austin to report that the local supervisor (a salaried employee) had a television set on her desk and was not doing the work she was supposed to perform. As a result, according to respondent, her sister (an hourly employee) performed extra work, consistently taking home

this work for completion at night and for which she was not being compensated. Respondent was concerned this was a wage-and-hour law violation.

The second instance, toward the end of July 1994, involved a related aspect of the matter involving respondent's sister. At a meeting with respondent, her sister, and the sister's supervisor, Sullivan informed the sister he might terminate her position when she returned because, upon reviewing her time cards, it seemed she was spending less time on certain tasks than would have been necessary to constitute a full-time position. The sister tried to explain that she did much of this work at home, but Sullivan reiterated that he could not assure her of a job when she returned from leave. Respondent recalled a similar layoff after a maternity leave under a previous general manager. She was concerned the current action involved prohibited retaliation for taking maternity leave. She contacted corporate staff in Austin and followed up with a memorandum to Austin. At the time of trial, respondent's sister was still employed by appellant.

Third, in mid-August 1994, Sullivan directed respondent to discipline two female employees who had taken time off when they did not have leave time available. Respondent was aware that several male employees had similarly taken leave without suffering disciplinary measures. Respondent raised this issue with Sullivan, who listened to her and then told her to do as she had been instructed. Respondent contacted corporate staff in Austin orally and in writing concerning this issue because of its potential gender discrimination implications.

In the fourth incident, on August 18, 1994, respondent tried to direct Sullivan's attention to the need to make the Mojave facility handicapped accessible. Sullivan's response was "that we just wouldn't hire any goddamn handicaps." Respondent reported the comment to corporate human resources staff.

Finally, toward the end of August 1994, Sullivan informed respondent that a department head was to be fired. The department head, "in his fifties," was to be replaced by a younger employee. The department head had received a poor performance review from his supervisors and, apparently unaware he was to be terminated, had come to respondent to find out how to challenge the review. Respondent met with Sullivan and received his permission to investigate the matter further, although Sullivan warned her "it's not going to do any good." Respondent received favorable reports about the department head from other management personnel. When Sullivan told her to fire the man anyway, respondent contacted corporate staff in Austin and wrote a memorandum to Sullivan and to respondent's own corporate superior pointing out potential age discrimination dangers that might arise from terminating the employee. Sullivan did not respond to the memorandum in any way. Although moved to a different position, the employee was not terminated.

During Sullivan's entire tenure at Mojave (he had started in Mojave in 1992 as a program manager), he and respondent "just didn't seem to hit it off very well. I felt that he did not like the idea of listening to a female manager," according to respondent. Respondent complained to the corporate human resources director that "every time I made a suggestion or a comment to him, he would turn things around where it became a screaming issue with him no matter what I said or did. [¶] I told him that it was starting to become very intolerable to be there and trying to appease [Sullivan] so that we could work together."

Starting in June of 1994, Sullivan directed respondent to handle the office switchboard (located just outside respondent's office) during some of the breaks taken by the regular switchboard operator. Respondent complained to the facilities manager that she was the only manager assigned this duty, but she did not take the matter directly to Sullivan because she "just viewed it as another—it was more indicative of him trying to get me upset."

In July of 1994, after respondent contacted corporate headquarters about requiring the hourly worker to work at home without pay, Sullivan entered respondent's office while she was in a meeting and "started yelling and screaming about me calling Austin." However, after the next time respondent contacted Austin in late July, Sullivan's treatment of her was not "anything different than how he had been treating me prior to that." "He seemed to be agitated all the time with me," according to respondent. Respondent's supervisor in Austin had the impression at this time that Sullivan was "picking on" respondent and "going out of his way to make her life difficult."

When respondent returned from a July vacation, she discovered her calendar/business diary was missing from her office. She learned Sullivan had been in her office and confronted him about the calendar. He denied any knowledge of the calendar.

On approximately August 26, 1994, Sullivan informed respondent, in front of other managers, that respondent was not a "team player" and did not appear to be "on management's side"; if this were the case, Sullivan said, he was inclined to transfer respondent's job to Austin. He suggested that perhaps respondent's husband would prefer that she not work at all.

By August of 1994, respondent had begun avoiding contact with Sullivan to the extent she could. Sullivan himself did not initiate contact, but when he was in the vicinity of respondent's office, he glared at her.

During the period from June through September 1994, respondent began to suffer continuous headaches; in addition, she was having stomach problems, nose bleeds and insomnia. She considered quitting her job and discussed this with human resources staff at corporate headquarters. Even though she had not decided to quit, she "knew that that's what it was coming down to." Although her entire experience with Sullivan was bad, during the last three weeks of respondent's employment the situation deteriorated: "[I]t became very intolerable. I was a wreck personally."

On August 31, 1994, respondent and Sullivan came into contact concerning the hiring of a new driver (also known as a "material expediter") at the Mojave facility. Sullivan was impatient to have the position filled, but respondent insisted it was necessary to post the job opening for two weeks to satisfy affirmative action requirements. Sullivan asked respondent whether she knew a "wetback" they could hire immediately to fill the position. Respondent is Hispanic, as Sullivan knew; respondent concluded Sullivan made this comment specifically to irritate her. She reported the incident orally to five people at corporate headquarters and by memorandum.

Respondent had no contact with Sullivan from the occasion of the "wetback" conversation until September 9, 1994. On that date, Sullivan summoned respondent to his office to inquire about the status of filling the driver position. Respondent reported that the job had been posted but that no one had been hired yet. Respondent said a minority applicant had applied for the position the day before. Sullivan wanted to know why they could not just hire the minority applicant immediately. Respondent told Sullivan that as a result of the 1992 Department of Labor audit, she was required to post every job for two weeks. The theory was that increasing the applicant pool and appellant's profile with local job agencies were goals of equal importance to the goal of actually hiring a minority applicant for any given position.

Sullivan thought this was a "stupid-ass rule" and told respondent he was going to call the Department of Labor auditor so he could "hear it from her because he didn't want to have to adhere to that." Sullivan was "shouting and screaming and cursing . . . shouting at the top of his lungs." He ordered respondent to bring the telephone number for the auditor from respondent's office.

Respondent did not think it was "a smart move" for Sullivan to call the auditor "in the mode that he was in," so respondent called corporate headquarters to warn them what Sullivan planned to do. She reached Elizabeth Haran, appellant's human resources manager in Austin. When she returned to Sullivan's office with the telephone number, Sullivan was engaged in a

conference call with the corporate director of human resources, Ronald Booth, and Haran. Sullivan was on the speakerphone and directed respondent to join the conference.

Sullivan was shouting at respondent "that he didn't ask me to go and make a phone call to Austin, he just wanted the [Department of Labor] number and that's not what he asked me to do and you're always calling Austin." Sullivan, according to respondent, was shouting and yelling, trembling and red-faced. She tried to leave the office but Sullivan ordered her to come back. (Respondent testified: "He screamed at me and yelled at me to come back, that he wasn't through with me.") In order to be heard by her colleagues in Austin, respondent had to stand next to the telephone and in close proximity to Sullivan. Sullivan became more and more agitated, to the point where respondent believed Sullivan was about to strike something in his anger; since she was standing next to Sullivan, she believed Sullivan might strike her. Respondent backed away, said "I quit," and announced that if she were to leave, "it was not going to end here." Sullivan calmed immediately and asked the other two persons if they had heard what respondent said. Booth told respondent he would call her. Respondent left Sullivan's office and returned to her own.

Booth conferred with a colleague in Austin and decided to accept respondent's resignation. When he called respondent, Booth got the impression respondent did not want to quit.

Respondent called the Tracor corporate ombudsman (who was also a vice-president of Tracor for human resources) in Austin and asked him to intervene. He said he would "have to look at his schedule" before committing to anything. Respondent left work at the end of the day, taking with her copies of documents from her own personnel file and copies of documents generated in the Department of Labor audit. She anticipated using these materials if corporate officials called her at home over the weekend.

On Monday, September 12, respondent again spoke with Booth, appellant's human resources director. He asked if she could continue to work with Sullivan. Respondent said she could if Sullivan were sent to "management school." Booth said that "wasn't going to happen." He said he would get back with respondent. Later, Booth told respondent to collect her personal belongings and to come back the next day for her final paycheck. Respondent also spoke to the corporate ombudsman, but he said he would be unable to come to Mojave "right away," citing his own busy schedule. When respondent left work at the end of the day on Monday, she took with her a file containing copies of documents involving various personnel issues she

had worked on over the past year. She never returned to the company any of the copies she took home.

## PROCEEDINGS

After exhausting her administrative remedies, respondent sued appellant on May 17, 1996, for wrongful termination of employment. Alleging that she was constructively discharged from employment by the intolerable and aggravated actions of appellant's managerial employees, respondent alleged discrimination on the bases of sex, race, and ancestry in violation of the Fair Employment and Housing Act, particularly Government Code section 12940. Respondent also alleged appellant constructively terminated her employment in retaliation for her assertion of the fair employment rights of others as prohibited by Government Code section 12940, subdivision (f). Respondent sought an award for lost wages, as well as general and punitive damages.

Trial began on March 4, 1998. On March 24, 1998, the jury returned a special verdict finding that respondent was not subjected to a hostile working environment based on her sex or national origin. The jury unanimously concluded respondent "was subjected to adverse employment action because of engaging in protected activities such as opposing any practices forbidden under the Fair Employment & Housing Act." The jury unanimously found respondent had been constructively discharged and that she had not engaged in "wrongdoing prior to or at the time of her resignation which would have given defendant grounds to terminate her had it known of her misconduct at the time of her resignation." The jury awarded loss of earnings damages in the amount of $340,000, general damages in the amount of $60,000, and (in a subsequent verdict) punitive damages in the amount of $200,000.

After judgment was entered on the verdict on March 30, 1998, appellant filed a timely notice of appeal. When appellant's motions for new trial and judgment notwithstanding verdict were denied, appellant filed a second notice of appeal. We ordered the two appeals consolidated.

## DISCUSSION

Appellant raises two issues on this appeal. First, appellant contends the record contains insufficient evidence to support the jury's determination that respondent was constructively discharged from her employment. Second, appellant contends the trial court abused its equitable discretion in rejecting appellant's defense based on "after-acquired evidence" of employment-related misconduct by respondent.

## I.

### *Constructive Discharge*

 Appellant contends there was no constructive discharge as a matter of law. "This argument calls for our determining whether substantial evidence supported the jury's verdict for respondent." (*Hardison v. Bushnell* (1993) 18 Cal.App.4th 22, 25-26 [22 Cal.Rptr.2d 106].) "Where findings of fact are challenged on a civil appeal, we are bound by the 'elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted,' to support the findings below. (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].) We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court." (*Jessup Farms v. Baldwin, supra,* 33 Cal.3d at p. 660.)

 An employer is considered to have discharged an employee when "the employer's conduct effectively forces an employee to resign. Although the employee may say, 'I quit,' the employment relationship is actually severed involuntarily by the employer's acts, against the employee's will." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244-1245 [32 Cal.Rptr.2d 223, 876 P.2d 1022] (hereafter *Turner*).) This form of termination of the employment relationship is commonly known as "constructive discharge" and it is "legally regarded as a firing rather than a resignation." (*Id.* at p. 1245.)

In *Turner*, the Supreme Court traced the development of the constructive discharge doctrine from cases decided under the National Labor Relations Act, through federal employment discrimination cases, and into state law wrongful discharge cases. (*Turner, supra,* 7 Cal.4th at p. 1246.) The opinion then traced the development of the standard in the appellate courts of California, noting there were two primary aspects necessary for a finding of constructive discharge: first, there must be intolerable working conditions; second, the employer must in some manner be held to knowledge of the conditions. (*Id.* at p. 1251.)

As to the second issue, the *Turner* court modified the law as it had been established by the Court of Appeal. Rejecting liability based on constructive knowledge, the *Turner* opinion held that the employer must "either intentionally create[] or knowingly permit[]" the intolerable conditions in order to be held liable. (*Turner, supra,* 7 Cal.4th at p. 1251.)

As to the first issue, however, *Turner* reaffirmed the "intolerable conditions" requirement in the same terms as it had been developed in the federal courts and in the California Court of Appeal: "The essence of the test is whether, under all the circumstances, the working conditions are so unusually adverse that a reasonable employee in plaintiff's position ' " 'would have felt compelled to resign.' " ' [Citations.]" (*Turner, supra,* 7 Cal.4th at p. 1247.) More specifically, "[t]he conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (*Id.* at p. 1246.)

The *Turner* opinion gives some examples of what does not constitute constructive discharge: "[A]dverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable. In general, '[s]ingle, trivial, or isolated acts of [misconduct] are insufficient' to support a constructive discharge claim. . . . Moreover, a poor performance rating or a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (*Turner, supra,* 7 Cal.4th at p. 1247, fns. omitted.)

These requirements from *Turner* were conveyed to the jury in the present case with BAJI No. 10.02 (8th ed. 1994), requested by appellant, as follows:

"A termination of employment may be either actual or constructive.

"It is actual when the employer notifies the employee, orally or in writing, that the employment is terminated.

"It is constructive termination when an employee resigns because an employer acting directly or through . . . persons effectively representing such employer, namely an officer, director, managing agent, or supervisory employee, either intentionally creates, or knowingly permits to exist, working conditions that are so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign.

"Adverse working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed intolerable. Single, trivial, or isolated acts of misconduct by an employer are generally insufficient.

"The length of time an employee remains on the job following the onset of the claim of adverse working conditions is a fact you may consider in

determining the intolerability of employment conditions from the standpoint of what a reasonable employee would have done under the circumstances."

The jury, as noted, unanimously found that "defendant either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of plaintiff's resignation that a reasonable employer would realize that a reasonable person in plaintiff's position would be compelled to resign."

■■■ Appellant contends there was no substantial evidence to support this finding; in particular, its argument on appeal states the evidence failed to establish an adverse employment action sufficient to cause a reasonable employee to resign. Appellant does not contest the sufficiency of the evidence to establish the other necessary elements of the "retaliation" wrongful discharge claim, namely, the existence of an employer/employee relationship, that respondent was engaged in the protected activity of opposing what she reasonably believed were unlawful employment practices, that respondent's protected activity was a motivating factor for appellant's actions, and that respondent was injured or damaged by appellant's actions. (See BAJI No. 12.10 (1997 new) (8th ed. 1994).)

There is a failure on appellant's part to recognize the substantial evidence standard of review in two critical ways that undermine its argument. First, appellant undervalues evidence the jury could and clearly did find credible. Second, appellant attempts to slice into separate incidents—and to evaluate individually—evidence from which the jury could and clearly did find a "continuous pattern" of conduct on the part of appellant and its employees. (See *Kovatch v. California Casualty Management Co.* (1998) 65 Cal.App.4th 1256, 1269-1270 [77 Cal.Rptr.2d 217] [sufficiency of evidence to raise triable issue of fact in summary judgment context].)

Appellant contends respondent only presented evidence of two instances in which Sullivan yelled at her. This argument disregards, without any discussion, respondent's testimony that Sullivan "seemed to be agitated all the time with me" and that respondent complained to the corporate human resources director that "every time I made a suggestion or a comment to [Sullivan], he would turn things around where it became a screaming issue with him no matter what I said or did." The argument ignores the testimony of respondent's supervisor in Austin that he had the impression that Sullivan was "picking on" respondent and "going out of his way to make her life difficult." Finally, the argument ignores the other kinds of harassment about which respondent testified. The jury could have credited respondent's testimony that she was assigned to the switchboard by Sullivan when no other

manager was, that Sullivan used the term "wetback" in a discussion with respondent, that Sullivan took respondent's business diary from her office during a vacation, and that Sullivan threatened to transfer respondent's job to Austin knowing that respondent's husband would be unlikely to agree to respondent's moving with the job. The jury could have inferred these actions were all intended by Sullivan to harass respondent and to contribute to an intolerable work situation.[1]

Additionally, appellant attempts to dissect Sullivan's treatment of respondent into distinct incidents; each incident is then claimed to be either trivial or a justified response to respondent's own acts. This view is justified, according to appellant, because respondent testified "she enjoyed working for Tracor."

This testimony must be viewed in the proper context. According to respondent, as the situation with Sullivan deteriorated, she began to lose hope that her corporate supervisors could effectively come to her aid. She said the Tracor human resources director thought he could "resolve some of the situations" with Sullivan, but that "at the end I don't think he felt that it would change." Appellant's counsel then asked: "All right. So why didn't you resign before that?" Respondent answered: "Because I—I enjoyed working at Tracor Flight Systems." Immediately prior to this testimony, respondent testified: "It was very hard to go to work there. We didn't have a good working relationship. I felt [Sullivan] was doing things to try to get me to leave and he was making comments to antagonize me."

Even lifted out of context, as appellant has done, this testimony by respondent is not a basis for holding that, as a matter of law, the jury was not permitted to give credence to respondent's extensive testimony about the part of her job she did not enjoy—namely, Sullivan's treatment of her and the physical and mental toll of that treatment upon her. This isolated portion of testimony does not compel a finding, as a matter of law, that respondent's complaints were trivial.

Yet, in appellant's view, this testimony requires that only the September 9, 1994, incident be considered in evaluating the evidence of constructive

---

[1]At oral argument, appellant's counsel contended we must disregard Sullivan's treatment of respondent prior to the first instance of "protected activity" in July of 1994. That is, counsel argued, Sullivan's action prior to that could not be viewed as retaliation for events that had not yet happened. While the latter point is clearly true, the first point is nevertheless incorrect. In determining whether a reasonable employee would have felt compelled to resign, the jury is entitled to consider all of the circumstances of the employment relationship. The jury is not required to start with an artificial baseline of a "normal" employer-employee relationship on the date of the first protected activity. The jury was entitled to conclude that Sullivan's retaliatory actions made what was previously just a bad situation into an intolerable situation.

discharge. In appellant's view, Sullivan's behavior on that date was provoked by respondent's lies when she called Austin; in any event, says appellant, Sullivan's conduct—"albeit loud, harsh and accompanied by profanity—could not, as a matter of law create 'intolerable' conditions of employment" because it "had none of the hallmarks that would turn *an isolated incident* into intolerable working conditions . . ." (Italics added.)

Respondent's counsel did not argue the case to the jury on the basis of the September 9, 1994, incident in isolation. Rather, counsel relied in part on Booth's testimony in which he "certainly" agreed that there were "a lot of occurrences where even though you can't recall the details of the conflict, Miss Thompson would end up telling you that Sullivan was yelling and screaming at her." He cited Booth's testimony that the "gist" of respondent's complaints was that Sullivan was constantly yelling and screaming and making an intimidating environment. As we have noted above, both Booth and respondent testified to a continuing and escalating conflict between Sullivan and respondent that clearly supported an inference that, in Booth's words, Sullivan was "picking on" respondent.

By contrast, appellant's counsel did not argue to the jury that the course of conduct to which respondent testified was inadequate to force a reasonable employee to resign. Instead, counsel argued that respondent was a liar—that the course of conduct simply did not occur in the manner respondent said it did: respondent, according to appellant's counsel, knew Sullivan thought she was incompetent as the human relations manager and she "begins to set a situation up to get back at Mr. Sullivan and ultimately to get back at her employer." Respondent's "disjointed and fabricated incidents" were only credible if every other witness is lying, according to appellant's counsel, who argued: "Credibility in this case is a huge, huge issue. And we submit the credibility of the plaintiff is a huge issue. As you heard her in rebuttal, witnesses are lying, she's not lying but everybody that we're—that we called up there is not telling the truth. [¶] I submit to you that if everybody isn't telling the truth and only Miss Thompson is telling the truth, we wouldn't be here at all and presenting these people to you."

The jury apparently did believe respondent's testimony (which, we will note, was corroborated in many important respects by Booth and by Elizabeth Haran, at least in the original version of her testimony). This evidence rationally supports a conclusion that a reasonable employee in respondent's position would have been compelled to resign her employment: Sullivan intentionally had made it impossible for respondent to do her job through a continuous course of intimidation and harassment. ■ This determination

that the "reasonable employee" would have been compelled to quit because of Sullivan's conduct is quintessentially a jury function. (See *Cotran v. Rollins Hudig Hall Internat., Inc.* (1998) 17 Cal.4th 93, 106, fn. 3 [69 Cal.Rptr.2d 900, 948 P.2d 412].) "Where the trial court or jury has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable." (*Rosales v. Thermex-Thermatron, Inc.* (1998) 67 Cal.App.4th 187, 197 [78 Cal.Rptr.2d 861].)

■ Finally, there is a thread of argument running throughout appellant's briefs summarized in the following statement from appellant's reply brief: "[C]onstructive discharge typically involves a combination of continual sexual or racial epithets, explicit physical threats or assault, economically adverse employment actions, or requiring the employee to personally engage in illegal activity." While actions unlawful in themselves may "typically" be a part of a constructive discharge case, they are not *required* to be. In the seminal United States Supreme Court constructive discharge case, relied upon by the *Turner* court, an employer constructively discharged its employees by reporting them to the Immigration and Naturalization Service as undocumented aliens. (See *Sure-Tan, Inc. v. NLRB* (1984) 467 U.S. 883, 894-895 [104 S.Ct. 2803, 2809-2811, 81 L.Ed.2d 732].) The United States Supreme Court recognized that an employer's "reporting of any violation of the criminal laws is conduct which ordinarily should be encouraged, not penalized." (*Id.* at p. 895 [104 S.Ct. at p. 2810].) Nevertheless, when such reporting "is in retaliation for the employee's protected union activity," it is properly characterized as a constructive discharge. (*Id.* at pp. 895-896 [104 S.Ct. at p. 2811].)

While the conduct may not be "ordinarily . . . encouraged," employers have the right to unfairly and harshly criticize their employees, to embarrass them in front of other employees, and to threaten to terminate or demote the employee. (*Casenas v. Fujisawa USA, Inc.* (1997) 58 Cal.App.4th 101, 115 [67 Cal.Rptr.2d 827] [performance review]; *Gibson v. Aro Corp.* (1995) 32 Cal.App.4th 1628, 1636 [38 Cal.Rptr.2d 882] [embarrassment, criticism, demotion]; *Soules v. Cadam, Inc.* (1991) 2 Cal.App.4th 390, 401 [3 Cal.Rptr.2d 6] [demotion]; see *Helgeson v. American Intern. Group, Inc.* (S.D.Cal. 1999) 44 F.Supp.2d 1091, 1098, 1100 [inter alia, threatened termination].)

Nevertheless, a continuous course of such actions, uncorrected by management, can constitute objectively intolerable working conditions. (See *Turner, supra,* 7 Cal.4th at pp. 1259-1260 (conc. & dis. opn. of Mosk, J.).)

■ As stated in *Turner*, "adverse working conditions must be unusually 'aggravated' *or* amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner, supra*, 7 Cal.4th at p. 1247, italics added.) Implicit in this disjunctive formulation is that even though individual incidents in a campaign of harassment do not constitute justification for an employee to resign, the overall campaign of harassment can constitute such a justification. (See *Etter v. Veriflo Corp.* (1998) 67 Cal.App.4th 457, 465 [79 Cal.Rptr.2d 33] [concerted pattern of harassment of a repeated, routine, or a generalized nature required to show hostile work environment]; *Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1123-1124 [75 Cal.Rptr.2d 27] [same].)

■ Appellant places significant reliance on this court's opinion in *Guthrey v. State of California, supra*, 63 Cal.App.4th at pages 1117-1118. Appellant contends *Guthrey* stands for the proposition that "plaintiff did not suffer [a] hostile working environment or adverse employment action although [his] supervisor loudly berated plaintiff in front of her [*sic*] peers while 'very aggressive' and 'real red in the face.' " Contrary to appellant's claim, the issue in *Guthrey* was not whether the employee had suffered a hostile working environment or adverse employment action. Rather, the issue was whether the employee had presented any evidence that would support an inference that the supervisor "handled the matter the way she did because of plaintiff's gender." (*Id.* at p. 1118.) The opinion specifically recognized that the employee's allegations concerning his supervisor "might raise a question of fact whether [the supervisor's] aggression reached the level of unwarranted hostility," but concluded that any nexus between the alleged conduct and the gender of the employee was "mere speculation." (*Ibid.*) Nothing in *Guthrey* supports a claim that severe verbal abuse of an employee *in retaliation for protected conduct* cannot constitute substantial evidence supporting a constructive discharge finding.

Viewing the evidence in the present case in the light most favorable to the verdict, the jury reasonably could have found a continuous pattern of conduct by Sullivan, uncorrected by higher management, that resulted in intolerable working conditions.

## II.

### *After-acquired Evidence*

■ The doctrine of after-acquired evidence shields an employer from liability or limits available relief where, after a termination, the employer

learns for the first time about employee wrongdoing that would have led to the discharge in any event. (*Camp v. Jeffer, Mangels, Butler & Marmaro* (1995) 35 Cal.App.4th 620, 632 [41 Cal.Rptr.2d 329].) The doctrine is the basis for an equitable defense related to the traditional defense of "unclean hands." (*Id.* at p. 638.) The doctrine has been summarized by the United States Supreme Court: "Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." (*McKennon v. Nashville Banner Publishing Co.* (1995) 513 U.S. 352, 362-363 [115 S.Ct. 879, 886-887, 130 L.Ed.2d 852].)

■ In the present case, there were conflicts in the evidence concerning respondent's actions, her motivations, and the possible consequences of her actions within appellant's disciplinary system. The trial court submitted those factual questions to the jury for resolution and then used the resulting special verdict as the basis for concluding appellant was not entitled to equitable reduction of the damages award. Appellant contends the trial court abused its discretion in reaching that conclusion. Upon review of the record in the light most favorable to the verdict, we find there clearly was substantial evidence to support the jury's conclusion that respondent's wrongdoing, if any, would not have resulted in termination of employment if appellant had known of the conduct. Accordingly, we conclude the court did not abuse its equitable discretion in refusing to bar recovery or limit respondent's damage award on the basis of the after-acquired evidence of respondent's acts at the end of her employment.

Respondent testified that she kept a separate file consisting of copies of personnel items about which she had contacted Austin so that she would have the items at hand when there was follow-up from corporate staffers. In the final days of her employment, after she had announced her resignation, respondent testified, she took this file home with her because she wanted to use these items in discussions with the corporate ombudsman when he called her or came to Mojave, as respondent expected him to at that time. During the same time period, she also copied and took with her portions of her own personnel file, documents from the Department of Labor audit file, and certain corporate manuals. Not only did she want these records with her in case the ombudsman called, but because of the missing business diary she feared the records might "disappear" also. Appellant testified she was authorized to take files and records home as part of her job and that she did so virtually every day throughout her employment, because she worked at home every night.

Appellant contended at trial that respondent's conduct in removing copies of files at the time of her resignation constituted wrongdoing that would have resulted in her termination if appellant had known what respondent was doing. Appellant presented the testimony of Ray Bradshaw, director of human resources for appellant at the time of trial, to establish the company's policy regarding termination and employee discipline.

Bradshaw's testimony was premised on the idea that respondent had removed company documents from the Mojave facility for her own personal use. He acknowledged that if respondent had taken the documents home for a company purpose or "a current project," her actions would have been fully authorized. He said appellant had a general policy of "progressive discipline" that involved supervisory counseling, written warnings, and suspension prior to termination. He added the comment that there was a "separate policy" recognizing "there are some violations that employees can be involved in that surpass any benefit to progressive discipline."

The jury unanimously found respondent had been constructively discharged and that she had not engaged in "wrongdoing prior to or at the time of her resignation which would have given defendant grounds to terminate her had it known of her misconduct at the time of her resignation." In employing a standard that focused on the phrase "would have given defendant grounds" to terminate respondent, the instruction applied a standard impermissibly favoring appellant. "As has been observed, 'proving that the same decision would have been *justified* . . . is not the same as proving that the same decision *would have been made*.' [Citations.]" (*McKennon v. Nashville Banner Publishing Co., supra,* 513 U.S. at p. 360 [115 S.Ct. at p. 885], italics added, omission in *McKennon*.)

Accepting as true respondent's testimony concerning her motivation and expectations in taking home the records, a reasonable jury could conclude that respondent acted within the scope of her prior authorization to take home documents, since she reasonably anticipated meeting with company officials from Austin. At the very least, substantial evidence permitted a reasonable jury to find that respondent's motivation in taking the documents home constituted poor judgment and not theft, and would have subjected her to, at most, lesser measures of "progressive discipline" instead of termination. Given the underlying factual findings by the jury, the court did not err in failing to bar recovery or equitably reduce the award of damages pursuant to the after-acquired evidence doctrine.

## DISPOSITION

The judgment is affirmed. Respondent is awarded her costs on appeal.

Harris, J., and Wiseman, J., concurred.