[No. F032238. Fifth Dist. June 4, 2001.]

MIKE LENK, Plaintiff and Respondent, v.
TOTAL-WESTERN, INC., Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I.B, II.A.2, II.A.4, and II.C.

## COUNSEL

Thomas J. Anton & Associates and Thomas J. Anton for Defendant and Appellant.

Law Offices of John C. Hall, John C. Hall; Law Office of David L. Saine and David L. Saine for Plaintiff and Respondent.

## OPINION

**WISEMAN, J.**—Plaintiff and respondent Mike Lenk (Lenk) filed suit against his former employer, defendant and appellant Total-Western, Inc. (TWI), for breach of contract and fraud. In a bifurcated trial, the jury found in favor of Lenk and awarded him $210,320 in compensatory damages, $50,000 in emotional distress damages and $1 million in punitive damages.

In the unpublished portion of this opinion, we reverse that part of the judgment awarding Lenk $210,320 in compensatory damages. We also reverse the punitive damages award, and remand the case for a new trial on those issues. In the published portion of this opinion, we determine the language in an employment agreement relating to a performance review after one year does not constitute a term of employment. We also find that emotional distress damages arising from a claim of fraud in inducing employment are not barred by the workers' compensation exclusivity doctrine.

## I. Procedural and Factual Histories

### A. *Liability phase*

In 1990, ARB Inc. (ARB), a general contractor with several divisions in the construction industry, hired Lenk as a purchasing agent in its Bakersfield, California office. In September 1995, ARB moved its headquarters from Bakersfield to Paramount, California, and promoted Lenk to corporate purchasing agent in the new office. Lenk was provided with a salary increase from $40,000 per year to $65,000 per year, approximately $10,000 of which represented compensation for the higher cost of living in the Los Angeles area. Following his promotion, Lenk continued to maintain his residence in Bakersfield. He utilized ARB corporate housing in La Palma for the first four months while looking for housing in the Los Angeles area, but was unable to find any appealing or affordable housing. Beginning in February 1996, Lenk commuted to work from Bakersfield or stayed in a motel in Los Angeles at his expense.

TWI, also headquartered in Paramount, was in the business of industrial contracting. During 1996, the company was actively searching for a purchasing agent. In May 1996, George Gray, a salesman for TWI and a former coworker of Lenk at ARB, saw Lenk at a social function. Lenk informed Gray of his new position at ARB. He did not tell Gray he was looking for a job. Gray expressed to Clarence Edens, Jr., the vice-president of TWI's Bakersfield office, that he felt Lenk was frustrated with having to travel between Bakersfield and Paramount and he believed there was an opportunity to recruit Lenk for the purchasing agent position at TWI. Edens instructed Gray to have Lenk forward his resume. After two subsequent calls from Gray, Lenk eventually forwarded his resume to TWI.

In a June 4, 1996, memorandum to Donald Grimes, the president of TWI from 1995 through 1998, Edens advised: "When making my original budget projections for this year, I grossly under estimated the total effort that would be required to turn our financial position around. An existing extreme financial position, an extreme negative business and professional image and an almost non-existent sales effort was just the tip of the iceberg. Add to these no employee morale and an aging decrepit equipment fleet and you begin to get an idea of the hole that we were in. [¶] . . . [¶]

"We will continue to revamp our purchasing department and [its] procedures[;] this must become an automated computerized effort. Our 'Inventory by Consignment' effort for consumable and expendables is almost complete. Detailed invoice review continues to clean up the system and eliminate

costly errors. Timely and accurate job cost tracking and reporting continues to be a significant problem. Our tracking is accomplished off-line and is a duplicative effort that is very tedious and expensive. Our current corporate computer accounting system will not support us in this area and there should be a sense of urgency in correcting this problem."

On June 9, 1996, Edens contacted Lenk and requested an interview with him. Lenk told Edens he was not looking for a job, but Edens replied, "It never hurts to talk." Lenk agreed to meet with Edens the following day. According to Lenk, he explained to Edens he had a secure position at ARB and had recently been promoted to the corporate level. In response, Lenk testified Edens represented that TWI planned to move its corporate head-quarters to Bakersfield and Lenk would be first in line for a corporate purchasing position with TWI. Edens provided Lenk with information concerning TWI's benefits and told him to call if he was interested. The two men exchanged several more calls. On July 5, 1996, Lenk telephoned Edens after reading a newspaper article about TWI that indicated it was a $40 million company and a subsidiary of a $200 million, family-owned conglomerate, Bragg Investment Company. The article quoted Edens. Edens told Lenk he intended to formulate a written offer and deliver it to him the following Monday.

Grimes estimated that in June 1996, TWI's annual revenues were approximately $30 million. Grimes questioned Edens about the July 1996 article, as he did not know the size of Bragg Investment Company and believed Edens would not have known the size either. Grimes never received a satisfactory answer as to where Edens obtained the revenue figures for TWI or Bragg Investment Company that were set forth in the article. Grimes never inquired whether Edens had communicated this information to any job applicants.

On July 8, 1996, Edens delivered TWI's written employment offer to Lenk. The offer stated, in pertinent part:

"After meeting with and discussing the possibility of you becoming a part of the Bakersfield [TWI] Team, I am excited about what you can contribute to our effort and the opportunities we can offer you.

"As a key member of our staff you will have the opportunity to turn our purchasing activity into a[] well organized effort and implement some [ideas] that you have developed yet not had the opportunities to see bear fruit and bring results. And while this is a staff position in the Bakersfield office I certainly think advancement to the corporate level is a distinct possibility. [¶] . . . [¶]

"I would like to propose the following to you:

| | |
|---|---|
| "Position Title: | Purchasing Agent |
| "Reporting Responsibilities: | [TWI]/Bakersfield, CA |
| | Reports to . . . Edens - Vice President |
| "Salary: | $55,000.00 Annually |
| "Performance Review: | To be completed after |
| | Twelve (12) month's employment |
| "Fringe Benefits: | Vacation: Two (2) weeks after one (1) year, |
| | Three (3) weeks after Five (5) years |
| | Holidays: Nine (9) paid holidays per year" |

On July 10, 1996, Lenk submitted a letter of resignation to ARB and accepted TWI's offer of employment. Lenk testified that, in accepting the position with TWI, he relied on the representations made to him by Edens and the written employment offer. Lenk entered into a written employment agreement with TWI that provided, in relevant part:

| | |
|---|---|
| "Salary: | $55,000.00 |
| "Performance Review: | To be completed after twelve (12) months employment |
| "Fringe Benefits: | Vacation: Two (2) weeks after one (1) year, three (3) |
| | weeks after five (5) years |
| | Holidays: Nine (9) paid holidays per year [¶] . . . [¶] |
| "Position Title: | Purchasing Agent |
| "Reporting Responsibility: | [TWI]/Bakersfield, California |
| | Reports to [] Edens - Vice President |
| "Reporting Date: | August 1, 1996 |

"I have read and acknowledge agreement to these terms and conditions."

The employment agreement, signed by Lenk and Edens, did not state that Lenk's employment was for any specific term. Lenk testified that he understood the language regarding the performance review to give him a minimum one-year term of employment. He believed he was committing his services for a minimum of 12 months. However, he acknowledged that no one at TWI ever told him so. In addition, no one at TWI ever told Lenk he could not be terminated except for good cause. Lenk believed he could be terminated after one year.

In July 1996, TWI's Bakersfield office had a net loss of approximately $540,000. Grimes estimated that during the 1996-1997 fiscal year, that office suffered a net loss between $1 million and $1.5 million.

On August 1, 1996, Lenk commenced his employment with TWI. He signed an employment application that stated: "I agree that my employment may be terminated by [TWI] at any time without liability for any additional compensation, wages or salary except such as may have been earned at the date of such termination. . . . I understand and agree if I am employed, such employment is for no defin[i]te period of time . . . ." Lenk was also provided with a copy of TWI's personnel manual and acknowledged reading and signing it. That manual provided:

"EMPLOYMENT AT WILL

"Your continuous employment depends on many factors beyond our control. Because of this we are an 'At Will Employer'. Carefully review the statement below. You will be asked to sign a copy of it at the back of this handbook. If you have any questions, contact the Director of Safety and Personnel before you accept employment.

" 'I understand that nothing contained in the employment application or conveyed during any interview intended to create an employment contract between me and the Company. In addition, I understand and agree, my employment is for no definite or determinable period and may be terminated at any time, with or without prior notice, at the option of either myself or the Company, and that no promises or representations contrary to the foregoing are binding on the Company unless made in writing and signed by me and the Company's designated representative.' "

Lenk did not object to signing either the employment application or acknowledgment of the personnel manual. Lenk testified that he knew he was an at-will employee, but he had an employment contract signed by him and a company representative.

Lenk replaced Gerald Powell, because Powell had no computer experience. Powell was transferred to TWI's tool room, and TWI offered to pay Powell's tuition for computer training classes. Powell enrolled in a 12-week computer course, twice a week after work. Lenk's annual salary was double Powell's salary. As a purchasing agent, Lenk made cost estimates, obtained material prices and purchased items needed in the company's operations. During his employment, Lenk also implemented an existing computerized program at TWI in the purchasing department of TWI's Bakersfield office.

Prior to Lenk's employment there was no computerization in that purchasing department.

On January 31, 1997, six months after he had started working for TWI, Lenk was terminated. Grimes advised Lenk he was being terminated for "economic reasons," but gave no other explanation. Grimes testified that a number of employees were laid off based on a downturn in business conditions, including the loss of a large contract with Chevron. Grimes did not consult with Edens prior to terminating Lenk. Lenk was provided with two weeks of severance pay.

In March 1997, Lenk was hired by a friend's company to make sales calls, and was paid on commission, earning approximately $2,300 per month. On May 1, 1997, Airpol Construction, Inc., hired Lenk as its purchasing agent, at an initial salary of $15.80 per hour. In September 1997, his pay was increased to $16.79 per hour. Lenk typically worked 10-hour days, longer working hours than he had at TWI, with fewer benefits. In 1998, Lenk's annual salary was approximately $47,800.

Lenk testified that he relied upon the representations made by Edens as to TWI's financial condition and Lenk's future with the company, and he would not have left his position at ARB had he known the truth. On July 14, 1997, Lenk filed suit against TWI alleging three causes of action: 1) fraud, 2) false representations to induce relocation in violation of Labor Code section 970, and 3) breach of contract.

In October 1997, Edens left TWI for a competing company. TWI accused Edens of improperly recruiting TWI employees for his new employer and making false statements to TWI's customers. Powell was ultimately returned to his previous position of purchasing agent in TWI's Bakersfield office.

A jury trial began on September 16, 1998. The jury found in favor of Lenk on his claims for "breach of contract, fraud—intentional misrepresentation, fraud—negligent misrepresentation, and fraud—concealment." The jury rejected Lenk's claim for fraud based on false promise. Lenk was awarded $210,320 in compensatory damages for lost past and/or future wages and benefits and $50,000 in emotional distress damages, for a total of $260,320. The jury also found Lenk proved, by clear and convincing evidence, that the conduct of TWI was fraudulent.

B. *Punitive damage phase**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 959.

## II. DISCUSSION

### A. *Sufficiency of the evidence*

TWI contends there is insufficient evidence in the record to support 1) judgment on the fraud claim, 2) judgment on the breach of contract claim, and 3) the economic damages award. We find sufficient evidence to support judgment on the fraud claim. However, we agree with TWI's latter two contentions.

### 1. *Standard of review*

■ A challenge in an appellate court to the sufficiency of the evidence is reviewed under the substantial evidence rule. (See *Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632 [80 Cal.Rptr.2d 378]; *Alderson v. Alderson* (1986) 180 Cal.App.3d 450, 465 [225 Cal.Rptr. 610] [substantial evidence standard applies to appeals from both jury and nonjury trials].) " 'Where findings of fact are challenged on a civil appeal, we are bound by the "elementary, but often overlooked principle of law, that . . . the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted," to support the findings below. [Citation.] We must therefore view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor in accordance with the standard of review so long adhered to by this court.' [Citation.]" (*Thompson v. Tracor Flight Systems, Inc.* (2001) 86 Cal.App.4th 1156, 1166 [104 Cal.Rptr.2d 95]; see also *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

■ Moreover, we defer to the trier of fact on issues of credibility. (*Oldham v. Kizer* (1991) 235 Cal.App.3d 1046, 1065 [1 Cal.Rptr.2d 195].) "[N]either conflicts in the evidence nor ' "testimony which is subject to justifiable suspicion . . . justif[ies] the reversal of a judgment, for it is the exclusive province of the [trier of fact] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' [Citations.] Testimony may be rejected only when it is inherently improbable or incredible, i.e., ' "unbelievable *per se*," ' physically impossible or ' "wholly unacceptable to reasonable minds." ' [Citations.]" (*Ibid.*)

### 2. *Fraud claim**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante*, page 959.

### 3. *Breach of contract claim*

Based on our finding of sufficient evidence to support the fraud claim, it would normally not be necessary to address whether there is insufficient evidence to support the breach of contract claim. (See *Watson v. Department of Rehabilitation* (1989) 212 Cal.App.3d 1271, 1291-1292 [261 Cal.Rptr. 204] [where several counts or causes of action, general verdict will stand if evidence supports it on any one specific count]; *Barragan v. Banco BCH* (1986) 188 Cal.App.3d 283, 304 [232 Cal.Rptr. 758] [appellate court has power to disregard particular cause of action in order to affirm judgment on any theory supported by the evidence].) ▮ However, since this case is being remanded, we address TWI's contention regarding the breach of contract cause of action. We conclude as a matter of law that the evidence is insufficient to support judgment on this claim. As a result, on remand, Lenk may only seek damages based on his fraud cause of action.

▮ In California, there is a presumption that employment is at will, absent an "express oral or written agreement specifying the length of employment or the grounds for termination." (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [254 Cal.Rptr. 211, 765 P.2d 373]; see also Labor Code, § 2922.) "This presumption may, however, be overcome by evidence that despite the absence of a specified term, the parties agreed that the employer's power to terminate would be limited in some way, e.g., by a requirement that termination be based only on 'good cause.' [Citations.]" (*Foley, supra*, 47 Cal.3d at p. 677.) While the absence of an express written or oral agreement concerning the terms of employment creates a presumption it is at will, this conclusion is by no means required. "[W]hen the parties have enforceable expectations concerning either the term of employment or the grounds or manner of termination, Labor Code section 2922 does not diminish the force of such contractual or legal obligations. The presumption that an employment relationship of indefinite duration is intended to be terminable at will is therefore 'subject, like any presumption, to contrary evidence. . . .' [Citation.]" (*Id.* at p. 680, fn. omitted; see also *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 336 [100 Cal.Rptr.2d 352, 8 P.3d 1089] [contractual understanding need not be express, but may be implied in fact, arising from parties' conduct evidencing their actual mutual intent to create enforceable limitations].)

▮ The record simply does not support Lenk's contention that he had either an express or implied contract for a minimum one-year term of employment. Lenk's employment agreement sets forth no term of employment. Lenk maintains the language in his written employment agreement relating to a performance review guaranteed him a minimum one-year term

of employment. We do not interpret the statement that a performance review is "[t]o be completed after twelve (12) months of employment" to constitute a minimum one-year contract term. (See *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865-866 [44 Cal.Rptr. 767, 402 P.2d 839] [appellate court may independently interpret written contract where no conflicting extrinsic evidence presented].) We find no ambiguity in the employment contract. (See *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554-555 [32 Cal.Rptr.2d 676] [ambiguity determination in contract is question of law subject to de novo review].) It plainly does not contain any specific term of employment.

In addition, there is no evidence that the parties otherwise agreed Lenk would have a minimum one-year term of employment or would be terminated only for cause. To the contrary, Lenk signed an employment application confirming he was an at-will employee and acknowledged receipt of a personnel manual with an explicit at-will provision. Moreover, Lenk admitted that no one at TWI told him he had a one-year employment contract or that he could be terminated only for cause. His contention now that "Edens told [him] . . . he would have his job at TWI for at least a year[]" has absolutely no support in the record. Lenk's "understanding" of the meaning of the performance review provision in the contract is not competent extrinsic evidence. (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1166, fn. 3 [6 Cal.Rptr.2d 554] [evidence of undisclosed subjective intent of parties irrelevant to determining meaning of contractual language].)

Thus, we find the evidence insufficient to support judgment on the breach of contract claim.

4. *Economic damages award**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

B. *Emotional distress damages*

■ TWI contends that Lenk's emotional distress damages are barred by the workers' compensation exclusive remedy rule. We disagree.

■ Labor Code section 3602[3] provides that the "sole and exclusive remedy" of an injured employee (or the employee's dependents) against an employer is the right to recover workers' compensation benefits, 1) if "the conditions of compensation set forth in [s]ection 3600 concur," and 2) unless an exception specified in section 3602, 3706 or 4558 applies.

---

*See footnote, *ante*, page 959.
[3]All statutory references are to the Labor Code unless otherwise indicated.

Section 3600 lists a number of conditions that must exist in order for the injured employee to recover workers' compensation benefits from his or her employer. Section 3600 states, in pertinent part:

"(a) Liability for the compensation provided by this division . . . shall, without regard to negligence, exist against an employer for any injury sustained by his or her employees arising out of and in the course of the employment . . . in those cases where the following conditions of compensation concur:

"(1) Where, at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division.

"(2) Where, at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment.

"(3) Where the injury is proximately caused by the employment, either with or without negligence."

If any of these conditions does not exist, the employee may bring a civil action against the employer. (§ 3602, subd. (c); see also *Seymour v. Setzer Forest Products, Inc.* (1954) 124 Cal.App.2d 608, 610-611 [268 P.2d 1084] [employee injured before shift began]; 2 Witkin, Summary of Cal. Law (9th ed. 1987) Workers' Compensation, § 40, pp. 593-594.) "[C]ase law . . . has greatly expanded the exceptions to the exclusivity rule . . . ." (*Hart v. National Mortgage & Land Co.* (1987) 189 Cal.App.3d 1420, 1427-1428 [235 Cal.Rptr. 68].) However, there is no exception to the exclusive remedy rule simply because an injury suffered on the job is not compensable under workers' compensation law. (See *Livitsanos v. Superior Court* (1992) 2 Cal.4th 744, 754-756 [7 Cal.Rptr.2d 808, 828 P.2d 1195]; *Williams v. State Compensation Ins. Fund* (1975) 50 Cal.App.3d 116, 121-123 [123 Cal.Rptr. 812].)

"[W]hen the misconduct attributed to the employer is actions which are a normal part of the employment relationship, such as demotions, promotions, criticism of work practices, and frictions in negotiations as to grievances, an employee suffering emotional distress causing disability may not avoid the exclusive remedy provisions of the Labor Code . . . ." (*Cole v. Fair Oaks Fire Protection Dist.* (1987) 43 Cal.3d 148, 160 [233 Cal.Rptr. 308, 729 P.2d 743].) The focus is on whether the conduct complained of was a normal risk of the employment relationship. (*Id.* at pp. 160-161.) Tort recovery for intentional misconduct is permitted where "conduct of an employer [has] a

'questionable' relationship to the employment, an injury which did not occur while the employee was performing service incidental to the employment and which would not be viewed as a risk of the employment, or conduct where the employer . . . stepped out of [its] proper role[]." (*Id.* at p. 161; see also *Shoemaker v. Myers* (1990) 52 Cal.3d 1, 16 [276 Cal.Rptr. 303, 801 P.2d 1054, 20 A.L.R.5th 1016] [exclusive remedy provisions not applicable to risks not "reasonably encompassed within the compensation bargain"]; *Usher v. American Airlines, Inc.* (1993) 20 Cal.App.4th 1520, 1524 [25 Cal.Rptr.2d 335] [exceptions to exclusive remedy rule include conduct outside proper role of employer and where employee's injury not viewed as risk of employment, such as injuries to one's reputation]; *Lopez v. Sikkema* (1991) 229 Cal.App.3d 31, 39 [280 Cal.Rptr. 7].)

 In addition, an employer's false statements made to induce a person to become an employee may be the basis for a civil lawsuit against the employer. (See *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 639-649 [49 Cal.Rptr.2d 377, 909 P.2d 981] [cause of action for fraudulent inducement of employment contract or promissory fraud stated; tort and punitive damages recoverable]; *Finch v. Brenda Raceway Corp.* (1994) 22 Cal.App.4th 547, 553-554 [27 Cal.Rptr.2d 531] [substantial evidence supported violation of § 970 where employer made knowingly false representation about projected length of employment].)

Here, we find TWI's conduct, in the form of misrepresentations made to induce Lenk to become an employee, was not a normal part of the employment relationship or a risk reasonably encompassed within the compensation bargain. (*Shoemaker v. Myers, supra,* 52 Cal.3d at p. 16; *Cole v. Fair Oaks Fire Protection Dist., supra,* 43 Cal.3d at pp. 160-161.) In essence, TWI stepped out of its proper role as an employer. The conduct alleged simply does not reflect matters that can be expected to occur with substantial frequency in the working environment. (*Id.* at p. 161; see also *Ramey v. General Petroleum Corp.* (1959) 173 Cal.App.2d 386, 402-403 [343 P.2d 787] [fraud claim against employer that conspired with third party to conceal from employee right to sue third party did not arise out of the employment; nor was it proximately caused by the employment].)

TWI relies heavily on *Spratley v. Winchell Donut House, Inc.* (1987) 188 Cal.App.3d 1408 [234 Cal.Rptr. 121], to support assertion that Lenk's emotional distress damages are barred by the exclusivity doctrine. *Spratley* is distinguishable from the case here. In *Spratley,* an employee assaulted by an intruder at her workplace filed suit against her employer for fraudulent inducement to enter into an employment contract. The employee claimed she would not have accepted the job but for the employer's fraudulent representations that it would make the workplace safe. The trial court sustained the

employer's demurrer to the complaint without leave to amend. (*Id.* at pp. 1410-1411.) In a two-to-one decision, the appellate court held that workers' compensation is the sole remedy for an employee injured by the employer's failure to provide a safe workplace. The court ruled the employee could not circumvent the exclusive remedy rule merely by alleging that her employer fraudulently misrepresented that extra security was being provided to protect night workers. (*Id.* at pp. 1412-1414; see also *Arendell v. Auto Parts Club, Inc.* (1994) 29 Cal.App.4th 1261, 1263-1266 [35 Cal.Rptr.2d 83] [tort action, for employer's negligent or reckless failure to provide adequate premises security despite knowledge of danger to employees, precluded by exclusive remedy provisions of workers' compensation law].)

In contrast, Lenk's fraud claim does not involve a claim of misrepresentation concerning employee safety. Workplace safety is clearly an issue contemplated by the workers' compensation statutory scheme. It is a normal part of the employment relationship and a risk reasonably encompassed within the compensation bargain. On the other hand, misrepresentations related to the financial stability of a company, the company's future plans to relocate its operations, and the job applicant's promotion in the corporate ranks, all designed to induce employment, are not (we hope) a normal part of the employment relationship.

Thus, we find the workers' compensation exclusive remedy rule does not bar Lenk's emotional distress damages.

C. *Punitive damages**

. . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The jury's findings on the fraud claim are affirmed, and with respect to the contract cause of action, its findings are vacated. The economic and punitive damages award is reversed. The case is remanded solely to determine the amount, if any, of economic and punitive damages on the remaining fraud claim. Costs are awarded to TWI.

Harris, Acting P. J., and Levy, J., concurred.

Appellant's petition for review by the Supreme Court was denied August 22, 2001.

---

*See footnote, *ante*, page 959.