Filed 6/18/13  Wong v. Brailey CA1/5
## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| GINGER WONG,<br><br>    **Plaintiff and Respondent,**<br><br>v.<br><br>MARK BRAILEY,<br><br>    **Defendant and Appellant.** | A136177<br><br>(Alameda County<br>Super. Ct. No. HG12633398) |

Mark Brailey (Brailey) appeals from civil harassment restraining orders issued against him in favor of his landlord, respondent Ginger Wong (Wong).  Brailey contends the court erred because Brailey was the one who was harassed, Wong used the restraining order procedure to evict him from his home in retaliation for his reports to the police about her children's wild parties, and neither the restraining order nor the subsequent one-year injunction were supported by substantial evidence.  We will affirm the orders.

## I.  FACTS AND PROCEDURAL HISTORY

A.  *Wong's Request for Temporary Restraining Order and Injunction Prohibiting Harassment*

On June 6, 2012, Wong filed a "Request for Civil Harassment Restraining Orders" seeking protection from Brailey for herself, her 18-year-old daughter, and her 16-year-old son.

### 1.  *Wong's Allegations*

In her declaration supporting her request, Wong alleged that Brailey was renting a room in her home.  Around 10:00 or 10:30 p.m. on June 4, 2012, Brailey screamed and

1

yelled at her, scaring her and her 16-year-old son.  In addition, Wong alleged, she had asked Brailey to move out since April 2012, and on each occasion he yelled and screamed at her and her children.  The dates of this harassment were allegedly April 10 or 12, May 7, June 1, and June 4.  Wong further alleged that Brailey's "erratic behaviors" caused her emotional distress, and that she and her children feared for their safety. According to Wong, Brailey stated that Wong and her children are "evil" and that they will "get what [they] deserve soon," which Wong considered a serious threat.  Wong requested that Brailey be removed from her residence as soon as possible, and that a temporary restraining order (TRO) be issued ex parte due to her concern for her safety and the safety of her children.

Attachments to Wong's request for an injunction disclosed her assorted attempts to persuade Brailey to leave the residence in April and May, 2012.  According to an attached narrative:  "I sent him a notice him [*sic*] on April 15th, 2012 and asked him to move out May 16th, 2012.  When this date came and passed and he was still residing in my home, I decided to follow up the notice by calling him over the phone.  He started yelling on the phone and called me, my children and their friends all evil and threatened that we will 'get what evil people deserve soon.'  I was shocked and fearful so I then called 911.  The police officers came into the house and knocked on his door but he refused to open it.  The officers then told me that I needed to go to court to get a restrainer [*sic*] order and a move out order."  Wong also asserted that Brailey yelled at her on the phone in subsequent calls and once in person on June 4, 2012.  She added: "We lock ourselves in every room we go to and don't feel safe sleeping under the same roof."

Other attachments purport to contain written notices to Brailey.  A handwritten note dated "5-15-16 [*sic*]" asked him to move out by the next day – "5-16-2012" – so she could clean and repair the home to get it ready for "inspectors."  In this note, she advised that Brailey was a "good renter."  In an email dated May 19, 2012, Wong referenced her request of April 15 and asked Brailey to move out by May 31, 2012, but for different reasons:  she could no longer rent the room to him because her older son was returning

2

from school, and the current arrangement might be an inconvenience to Brailey and to her children. Then on May 26, 2012, she sent Brailey an email asking him to vacate the room by May 31, 2012.

2. *TRO Issued*

The court issued the requested TRO on June 7, 2012. The TRO prohibited Brailey from harassing and contacting Wong and her children, ordered him to stay away from them, and ordered that he immediately vacate the premises. The TRO was set to expire on June 28, 2012, the date scheduled for the hearing on Wong's request for an injunction.

The sheriff served Brailey with the order and supporting documents on June 8, 2012, and apparently removed him from Wong's residence on that date, without advance notice. (Another proof of service, signed by an individual and filed with the court on June 19, 2012, represented that this individual also served Brailey personally; the proof of service, however, does not state when or where the purported service was accomplished.)

3. *Continuance of Hearing Date*

After securing Brailey's ouster from his home, Wong requested that the June 28 hearing date be postponed, because she had a "planned vacation between 6/17/2012 to 07/03/2012 since January," as shown by an "[a]ttached air ticket copy." Actually, the attached email indicates that the purchase of her ticket was not in January, but on April 26, 2012. Nonetheless, the court continued the hearing to July 5, 2012, and the TRO was reissued until that date.

B. *Brailey's Response to Request for Anti-Harassment Injunction*

Brailey filed his "Response to Request for Civil Harassment Restraining Orders" on June 29, 2012. In his response, Brailey disagreed with the proposed orders and attached five pages of narrative, along with police history reports for three calls he had made to the police. Essentially, Brailey denied harassing Wong or her children and asserted that the children and their teenage friends had been harassing him for nine months (June 2011-March 2012) "through extremely rowdy partying-turned

3

harassment (yelling, screaming, slamming doors, running and body-slamming each other against walls, stalking, intimidation, etc.), often while drunk and/or stoned."

In particular, Brailey denied yelling and screaming at Wong's children and asserted that he had not spoken to Wong since July 2011 (to complain about her son's rowdy or illegal behavior) except for three phone calls and one in-person conversation. He acknowledged that he and Wong both shouted during two of those three telephone calls, characterizing it as "verbal sparring," not harassment. As to the in-person conversation on June 4, 2012, Brailey asserted it was "a staged scene in which she waited for me to come home at 10:30 pm, my usual time, and asked yet again: 'So when are you going to move?'" Brailey denied screaming and yelling at her, insisting that he calmly told her that California law requires a 60-day notice, whereupon Wong's older 22-year-old son emerged from a dark kitchen and stood with folded arms in a "confrontational style."

Brailey also denied making any threats. He acknowledged that during one of their conversations, he told Wong that she and her children and their friends were "evil" (because the children harassed him and she allowed it) and that their "disgraceful" behavior would come back to her in karma and one day they would face God for their actions. He denied saying that they would get what they deserve "soon."

Brailey argued that Wong's request for the TRO was simply "payback" for his calling the police to report her children's loud parties. After at least one of those calls, he contended, Wong was cited and fined. He attached police history reports reflecting his calls to police after 10:00 p.m. on March 31, 2012, after 3:00 a.m. on April 15, 2012, and after 1:00 a.m. on May 16, 2012, each of which reported a disturbance due to ongoing problems with the minors partying in the house.

Brailey further alleged that Wong's children and their friends harassed him in other respects. Among other things, in January 2012, Wong's son, her daughter's boyfriend, and 10 to 15 other teenage boys stalked him for a mile to the house. As he walked, they drove alongside; then they walked beside him to the front door of the house

4

and formed a "gang-like semi-circle" behind him, with Wong's son standing between Brailey and the door. Brailey noted that he was 55 years old and mobility-impaired.

C. *Hearing*

The hearing on Wong's request for an injunction prohibiting harassment took place on July 5, 2012. Wong and Brailey were the only witnesses.

1. *Testimony*

Wong testified that she was intending to ask Brailey to move because her older son was returning home, but before she sent Brailey "the note," her younger son had a party in April (around the 9th or 10th) and Brailey called the police. When the court asked why she did not file for an eviction, Wong responded "I don't know" and added that she just decided to write a note to him. When she called him about two weeks later, "he start, you know, cursing me, say all of this stuff that was really fearful, and I was really scared." So Wong called the police, and when they arrived and obtained no answer from knocking on Brailey's door, they purportedly suggested she get a restraining order. Because a friend thought she should give Brailey more time, however, Wong sent Brailey an email. After this second notice to Brailey, she called him, and when "he start," she hung up on him.

The court then asked Brailey why he should not be ordered to stay away from Wong's house and not contact her family. He replied that he had "never harassed anybody" in his life, and it was Wong's children who harassed him. When the court asked Brailey whether he had said that Wong and her children were evil and will get what they deserve soon, Brailey acknowledged that he said Wong and her children were evil, and in light of the disgraceful way Wong's children had treated him for nine months he also said, "This will come back to you. You will answer to God." Brailey further told the court: "So that's how I think. God gets revenge. I never do. I never hurt person – I am totally – I hate aggression, I hate fighting. I am a nonviolent person, totally. And I do believe in God. And if you believe in God, you don't believe in violence. That, I believe."

With that, the court worked out a day for Brailey to retrieve his belongings from the residence in the accompaniment of the sheriff and announced the permanent injunction. The court also acknowledged Brailey's claim that Wong had harassed Brailey, but advised that the issue before the court was only what Wong and her children had experienced.

### 2. *Court Order*

The court issued a one-year injunction, prohibiting Brailey from harassing or contacting Wong or her children, and ordering Brailey to stay away from them and their premises.

This appeal followed.

## II. DISCUSSION

A person who has suffered "harassment" as defined in Code of Civil Procedure section 527.6, subdivision (b), may seek an injunction prohibiting the harassment and, in certain circumstances, a temporary restraining order. (§ 527.6, subd. (a).)[1] "Harassment" in this context is defined as "*unlawful violence*, a *credible threat of violence*, or a knowing and willful *course of conduct* directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose." (§ 527.6, subd. (b)(3), italics added.)

"Unlawful violence" means an assault, battery, or stalking. (§ 527.6, subd. (b)(7).)

"Credible threat of violence" means a "knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose." (§ 527.6, subd. (b)(2).)

A " '[c]ourse of conduct' " is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, making harassing telephone calls to an individual, or sending harassing correspondence to an individual by any means, including, but not

---

[1] Except where otherwise indicated, all statutory references are to the Code of Civil Procedure.

6

limited to, the use of public or private mails, interoffice mail, facsimile, or computer email. Constitutionally protected activity is not included within the meaning of " 'course of conduct.' " (§ 527.6, subd. (b)(1).) "The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (§ 527.6, subd. (b)(3).)

We review the court's factual findings for substantial evidence. (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137.)

A. *Temporary Restraining Order*

Under section 527.6, a temporary restraining order may be issued based "on a declaration that, to the satisfaction of the court, shows reasonable proof of harassment of the petitioner by the respondent, and that great or irreparable harm would result to the petitioner." (§ 527.6, subd. (d).)

In regard to harassment, Wong's declaration asserted: (1) on June 4, 2012, Brailey screamed and yelled at Wong and scared her and her 16-year-old son; (2) Brailey yelled and screamed at Wong and her children when Wong asked Brailey to move out around April 10 or 12, May 7, and June 1; (3) Brailey's "erratic behaviors" caused Wong emotional distress and she and her children feared for their safety; and (4) Brailey stated that Wong and her children are "evil" and that they will "get what evil people deserve soon," which Wong considered a serious threat.

It is a close question whether Wong's allegations showed reasonable proof of harassment and great or irreparable harm. There was no allegation of "unlawful violence" (assault, battery, or stalking) and there was no allegation of a "course of conduct" of communications that would cause a reasonable person substantial emotional distress: the allegations were simply that Brailey yelled and screamed in three or four conversations she initiated over the course of several weeks concerning her desire for him to move out. (See § 527.6, subd. (b)(3).) As to Brailey's alleged statement that Wong and her children would "get what evil people deserve soon," there was no accompanying allegation that Brailey had ever been violent or threatened any physical harm or harm with a weapon, and no allegation concerning his tone of voice or demeanor when he said

7

those words.  About two weeks had passed since he allegedly made that statement, apparently without any violent incident, and the statement is indeed susceptible of many interpretations.

Nonetheless, we conclude that *one* of the possible reasonable interpretations of the statement, based on the allegations then before the court, was that Brailey was going to retaliate in some physical or violent manner against Wong and her family due to her request that he leave the premises, and that this retaliation was about to occur "soon." Given this plausible interpretation, there was adequate proof that his statement was sufficient to "place a reasonable person in fear for his or her safety, or the safety of his or her immediate family." (§ 527.6, subd. (b)(2).)  Also based on this interpretation, we conclude that Wong's allegations were sufficient to provide reasonable proof that great or irreparable harm was going to result to Wong or her children without the restraining order.

Because Wong's allegations were sufficient for issuance of a temporary restraining order, the court was within its authority to order Brailey not to harass or contact Wong and her children.

The portion of the restraining order requiring Brailey to vacate his home – without notice or opportunity to be heard, and without so much as an allegation of prior violence, a specific threat of violence, or suspected possession of a weapon – gives us pause, however.  Certainly the anti-harassment statutes cannot be manipulated by landlords to effect the *ex parte* judicial ouster of a tenant as an end-run around our state's eviction laws. (See *Marquez-Luque v. Marquez* (1987) 192 Cal.App.3d 1513 (*Marquez-Luque*).) Wong and Brailey had a landlord-tenant relationship, and the attachments to Wong's declaration make it clear that she had been trying various arguments to induce him to leave the premises – never claiming that he was ever violent or abusive – and her request for an order rousting him from his residence was filed only a few days after he failed to move out by her deadline. (Civ. Code, §§ 1624, subd. (a)(3), 1940.)  Moreover, even in the context of family law orders for the removal of one of the residents, such orders are limited to instances where there is specific evidence of violence or the risk of violence.

8

(Fam. Code, § 6321, subd. (b) [dwelling exclusion order may issue ex parte only upon a sufficient showing that an assault has occurred or been threatened and physical or emotional harm would result].)

On the other hand, given at least the potential threat of violence, the court could have reasonably concluded that the only practical way of effecting the permissible anti-harassment, no-contact, and stay-away portions of the TRO was to order Brailey's temporary removal from the premises pending the injunction hearing. After all, the court did not order that Brailey be permanently evicted, but that he not stay on the premises for about three or four weeks until the matter could be heard. And although Brailey was Wong's tenant, this was not a typical landlord-tenant situation where the landlord and tenant maintained separate residences, in the sense that the landlord could be secure behind the locked doors of his or her home. (Wong noted that she and her children were able to lock the doors of their rooms, but the inference from the record is that there were at least certain common areas, such as halls and the kitchen, where Brailey could contact them.) Given that Brailey lived in the same residence with Wong and her children, Brailey has not established that the court erred in issuing the TRO.[2]

B. *Permanent Injunction*

A permanent injunction prohibiting harassment may issue "[i]f the judge finds by clear and convincing evidence that unlawful harassment exists." (Code Civ. Proc., § 527.6, subd. (i).) In our review of the court's issuance of the injunction, we consider

---

[2] In *Marquez-Luque, supra,* 192 Cal.App.3d 1513, it was held that the trial court had erred in issuing a TRO and permanent injunction evicting the defendant from his residence, even though the petition alleged that the defendant possessed guns, served time in prison for violent felonies, and threatened to kill the plaintiff and burn the house if she took the house from him in probate. The court explained: "While defendant's threatening conduct may have, and did, justify a personal injunction prohibiting the conduct itself, removal from the home was not a remedy authorized by the section [§ 527.6]." (*Marquez-Luque*, at p. 1517.) In *Marquez-Luque*, however, "there was no evidence that [defendant's] mere presence in the home caused plaintiffs substantial emotional distress, or that his possession of the home was intended to harass or annoy plaintiffs." (*Ibid.*)

not only Wong's declaration and Brailey's written response, but also the testimony and evidence proffered at the hearing.

For reasons explained *ante*, neither Wong's declaration nor the evidence at the hearing provided clear and convincing evidence of "unlawful violence" or a harassing "course of conduct" within the meaning of section 527.6, subdivision (b). The only instances of purported harassment arose on four occasions when Wong approached Brailey about moving out, there is no allegation of what was said except that Brailey was yelling, three of those incidents occurred over the telephone, and this course of conduct had not continued after Brailey was displaced from his residence. Indeed, the record of the hearing indicates that the court focused instead on Brailey's alleged statement that Wong and her children would get what they deserved soon.

In regard to Brailey's purported threat, the court had before it conflicting accounts: Wong alleged that Brailey told her they would "get what evil people deserve soon," but Brailey testified that instead he said, "This will come back to you, you will have to answer to God." The court implicitly found Wong's account more credible. Because the court was in a position to observe the witnesses and their demeanor at the hearing, we are required to defer to this determination and accept Wong's version. (*Lenk v. Total-Western, Inc*. (2001) 89 Cal.App.4th 959, 968.)

As discussed *ante*, a statement like "you will get what evil people deserve soon" is susceptible of many different interpretations. Certainly the case against Brailey would have been stronger if there had been evidence that he was violent in the past, possessed a weapon, had uttered more specific threats, or made the statement with an aggressive demeanor or tone of voice. Again, however, one reasonable inference from the evidence is that the statement was sufficient to place in fear both Wong and her children, as well as a reasonable person under the circumstances, and the court was in the best position to evaluate the evidence in light of its observations of the parties at the hearing.

In the final analysis, it is not our role to reweigh the evidence, and we cannot substitute our inference from the evidence for the inference drawn by the trial court, provided substantial evidence exists to support the trial court's conclusion. (*Bickel v.*

10

*City of Piedmont* (1997) 16 Cal.4th 1040, 1053; *Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) For the reasons stated, substantial evidence supported the court's conclusion there was clear and convincing proof of harassment entitling Wong to the issuance of the permanent injunction.

C. *Brailey's Additional Arguments*

We next consider Brailey's arguments to the extent they have not already been addressed.

1. *Brailey's Argument That He Was Harassed*

Primarily, Brailey argues that it was he who was harassed. He describes unsupervised parties that became progressively rowdy and more frequent over a span of months, Wong's refusal or inability to do anything about them, and their continuation in a manner that Brailey viewed as harassment. He also describes more direct harassment by Wong's children and their friends. The minors purportedly stalked him in their cars, surrounding him at one point in January 2012 with 10-15 male teenagers in a "ganglike" confrontation. After Brailey made his first call to the police in March 2012 and, according to Brailey, Wong was cited for allowing underaged drinking in her home, Wong's daughter and boyfriend allegedly feigned ramming Brailey with a Ford Bronco. Brailey claims that his second call to the police on April 15 resulted in Wong again being cited for underage drinking (and marijuana consumption) in her house, and that three days after his third call to police in early May, Wong called Brailey for the first time to get him to move out. In that conversation, Brailey contends he expressed his view that Wong was asking him to leave in retaliation, he also made the statement that Wong later rephrased in her request for a TRO and permanent injunction, and Wong hung up on him. While he was out looking for another room to rent, Wong summoned the police, who arrived and allegedly stated in their report that he had not said anything to threaten her. Wong called Brailey a second time in May, and when Brailey asked for legal notice to vacate, she hung up on him. Brailey further contends he never received Wong's emails. And when Wong called a third time on June 2 and he asked for formal notice to vacate, she said her attorney would "have [him] out of here in one day." Brailey

11

denies yelling during their in-person conversation on June 4, which he contended was a set-up to justify the request for the TRO.

We have considered Brailey's assertions fully. But whether or not Brailey was harassed by Wong's children and their friends (or even whether he could have obtained a harassment injunction against them), the question before the trial court – and here on appeal – was not whether there was sufficient evidence of harassment by them against him, but whether the evidence of Brailey's purported threat that they would soon get what evil people deserve was sufficient to constitute harassment by him against them. For the reasons stated *ante*, it was.

### 2. *Brailey's Other Arguments*

Brailey contends that the court ignored his written testimony and the police reports of his telephone calls, both of which were attached to his response to Wong's request for the civil harassment orders. (See Code Civ. Proc., § 527.6, subd. (i) [court shall receive any testimony that is relevant].) There is, however, no indication that the court ignored this material. The fact that the court did not embrace Brailey's view of what occurred, or conclude that his statement of harassment by Wong's children should preclude an injunction against him, does not demonstrate that the court paid no attention to what Brailey had presented. Nor does the reporter's transcript indicate that Brailey sought admission of any other reports or evidence at the hearing.

Brailey also contends that the TRO, and particularly the part of the TRO that removed him from the premises, constituted an eviction in retaliation for his complaints about the partying and harassment of Wong's children and their friends. Whether Wong's motive was retaliatory or not, however, the question is whether there was substantial evidence to support the court's findings that Brailey's statement was sufficient to cause Wong and her children (and a reasonable person) to fear for their safety, and great or irreparable harm would otherwise result. And while Wong's credibility could be diminished if her purposes were to retaliate rather than to obtain protection, the credibility determination was for the trial court.

12

Brailey cites Civil Code section 1942.5, which precludes a landlord from certain acts, including bringing an action to recover possession of the premises, in retaliation for the tenant's complaint to authorities about the premises' tenantability or the tenant's lawful and peaceable exercise of any right. (Civ. Code, § 1942.5, subds. (a), (c).) Assuming without deciding that Civil Code section 1942.5 could apply here, an exception arises where the landlord stated in the notice of the action a nonretaliatory ground for recovering possession and established that ground at a trial or hearing. (Civ. Code, § 1942.5, subd. (e).) Here, Wong's request for the TRO and permanent injunction, and the evidence at the hearing, established a nonretaliatory basis for excluding Brailey from the premises.

Brailey also suggests that the court based its finding of harassment on Brailey's constitutionally-protected calls to the police. We do not read the record that way. In any event, because there was substantial evidence of a credible threat of violence sufficient for issuance of the TRO and injunction, the court's orders would be affirmed on the basis of the threat, whether or not the court considered Brailey's calls to the police. (*D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, 18-19.)

Lastly, Brailey posits several other arguments, such as: the court was biased against him; he was intimidated by the court's disdain; the court reporter transcribed the hearing inaccurately; and the court was "non-conversant" because it only asked a few questions. We have considered these and all of Brailey's arguments in full and conclude that he has failed to demonstrate reversible error.

III. DISPOSITION

The orders are affirmed.

_____

NEEDHAM, J.

We concur.

_____

JONES, P. J.

_____

BRUINIERS, J.

14