Filed 6/27/14  In re C.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re C. M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>M. M.,<br><br>Defendant and Appellant. | D065071<br><br>(Super. Ct. No. J518353) |

APPEAL from an order of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

William Henry Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Erica R. Cortez, Deputy County Counsel, for Plaintiff and Respondent.

I.

INTRODUCTION

M.M. appeals an order terminating her parental rights to her minor son, C.M., under Welfare and Institutions Code section 366.26.[1] M.M. asserts that the juvenile court erred in terminating her parental rights because there is not substantial evidence to support the court's determination that the beneficial parent-child exception to adoption applies. We conclude that substantial evidence supports the trial court's determination, and we affirm the order.

II.

FACTUAL AND PROCEDURAL BACKGROUND

In February 2012, M.M. attempted to cross into the United States from Mexico while transporting 31 pounds of methamphetamine concealed in a hidden compartment of her vehicle.[2] C.M., who was six years old at that time, was riding in the back seat of the vehicle. M.M. had taken C.M. along in order to attempt to avoid being referred to secondary inspection. M.M. admitted that she knew she was transporting narcotics, and acknowledged that she was to receive $600 upon delivering the vehicle to a location in San Bernardino. M.M. was arrested, and C.M. was taken into protective custody.

---

[1] Further statutory references are to the Welfare and Institutions Code.

[2] The vehicle was registered to M.M., and the gas tank had been customized as a hidden compartment.

M.M. had previously been arrested for drug trafficking in 1992, and was convicted of a drug-related charge in 1994, for which she was sentenced to 44 months in state prison.

The San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of C.M. under section 300, subdivisions (b) and (g). The petition alleged that C.M. was at risk of suffering serious physical harm as a result of M.M.'s inability to supervise or protect him.

At a detention hearing the same day, the juvenile court found that the Agency had made a prima facie showing that C.M. was a child described by section 300, subdivisions (b) and (g), and detained C.M. out of his mother's care.

At the contested adjudication and disposition hearing, the juvenile court made a true finding on the section 300, subdivision (b) petition. The court assumed jurisdiction, declared C.M. a dependent of the juvenile court, removed him from parental care, and placed him in the home of a maternal uncle. The court ordered reunification services for M.M. and set a review hearing. The court ordered that M.M. was to receive supervised visits.

C.M.'s adult sister had initially agreed to take him to the local jail to visit M.M. and to supervise the visits. At a later point in time, the Agency worked with C.M.'s maternal uncle to organize visits between C.M. and M.M. Between February and April 2012, the Agency made efforts to arrange visitation. However, M.M. was relocated to multiple different facilities during this time, which prevented the visits from taking place.

On April 20, 2012, the Agency established a telephone account for M.M. to use to contact C.M.

M.M. pled guilty to conspiracy to import methamphetamine and was sentenced to five years in federal prison in July 2012. Although M.M. was initially housed in San Diego County, she was later moved to a correctional institution in Dublin, California. M.M.'s projected release date is June 19, 2016.

The record indicates that, "[d]ue to her incarceration [M.M.] ha[d] not been able to participate in the recommended [reunification] services." In October 2012, the Agency filed a modification petition requesting that the court terminate M.M.'s reunification services because she would be unable to reunify with C.M. "in the time allotted by the court." C.M.'s maternal uncle indicated that he would be willing to care for C.M. for as long as necessary.

At the contested six-month review hearing on November 7, 2012, the court denied the Agency's petition. The court found that M.M. had made "some progress with the provisions of her case plan and set a 12-month review hearing date for April 2013.

At the 12-month review hearing on April 15, 2013, M.M. reported that she had had "good phone contact" with C.M. C.M. reported that his mother called him regularly, but also said that sometimes she would not call because she claimed to not have any money to pay for the call.[3] According to C.M.'s maternal grandmother, M.M. would call C.M. primarily on the weekends. She also sent him "coloring pages" that he would color

---

[3]     The Agency continued to deposit money on M.M.'s telephone card. In addition, she was apparently working full time at the prison's call center.

and send back to her.  C.M. and M.M. had no face-to-face contact because of the distance between where he was living and the facility in which she was incarcerated.

At this review hearing, the juvenile court found that M.M. had not made substantial progress with her case plan, and concluded that there was not a substantial probability that C.M. would be returned to her custody within six months.  The court found by clear and convincing evidence that the return of C.M. to his mother would create a substantial risk of detriment to his physical and emotional well-being.  The court terminated M.M.'s reunification services and scheduled a section 366.26 hearing to select a permanent plan for C.M.

The juvenile court held a contested section 366.26 hearing on November 8, 2013.  The court received in evidence an August 12, 2013 addendum report, the section 366.26 assessment report dated September 24, 2013, and an October 22, 2013 addendum report.

Social worker Monica Osuna prepared the assessment and addendum report, in which she recommended that the court terminate M.M.'s parental rights and order a permanent plan of adoption.[4]  Osuna concluded that C.M. was highly adoptable because he suffered from no significant health, developmental, behavioral or mental health problems.  Thirty-five families in San Diego County had been approved to adopt a child matching C.M.'s characteristics, and C.M.'s maternal uncle, who was his caregiver, had

---

[4]     Osuna possesses a bachelor's degree in child and family development and a master's degree in social work.  She has been a social worker for over seven years and has training in child development, risk assessment, and concurrent planning.

expressed his commitment to adopting C.M. C.M.'s uncle had passed the preliminary background checks.

A social worker from San Bernardino County provided monthly courtesy contacts for the Agency with C.M., since C.M. was living with his uncle outside of San Diego County. The social worker reported that C.M. was aware that his uncle wanted to adopt him and was happy with that decision. The social worker also reported that C.M. expressed being happy in his uncle's home, and that C.M. had a good relationship with his uncle and with the other extended family members who lived in the home. C.M. had been in his uncle's care for two years at that point, and C.M.'s uncle had had a relationship with C.M. since his birth. According to C.M.'s maternal grandmother, "[C.M.] is happy his relative caregiver is going to adopt him because he is now going to have an 'uncle daddy' and he will be able to learn and do a lot of fun things with him."

In recommending adoption for C.M., Osuna indicated that in her opinion, C.M. shares a bond with his mother, but their relationship is not a parent-child relationship. Although C.M. and M.M. maintained some telephone contact during the reporting period, and C.M. would try to write or color a picture for M.M. at least once a month, he had expressed not wanting to have any face-to-face contact with his mother. C.M.'s uncle reported that C.M. does not ask M.M. when he will be able to see her, and does not appear to be upset when he hangs up the telephone after a conversation with her.

Osuna was of the opinion that a permanent plan of adoption would provide C.M. with a stable loving home where he would be afforded consistency and a sense of belonging. C.M. had developed a bond with, and an attachment to, his uncle. He looks

to his uncle for love, security and support. C.M. is thriving under his uncle's care. His academic skills have improved to the extent that he no longer needs an individualized education plan (IEP). C.M. participated in a reading competition in September 2013, and came in first place in his class.

M.M. testified that she felt she had done everything that she could to be the best mother she could be. She testified that sometimes she has regular contact with C.M., and at other times, does not. According to M.M., her mother had told her that she could call C.M. only on Saturdays and Sundays. M.M. acknowledged that she had spoken with C.M. only twice in July 2013, three times in August, five times in September, and not at all between September 29, 2013 and November 8, 2013. M.M. asserted that lack of telephone contact for over a month was due to the fact that "whoever's in charge of the house phone [where C.M. was living] didn't pay the phone bill."

At the conclusion of the hearing, the juvenile court found by clear and convincing evidence that none of the circumstances listed in section 366.26 subdivision (c)(1) existed, i.e., that there was nothing that would make the termination of parental rights detrimental to C.M.. The court terminated parental rights and ordered adoption as C.M.'s permanent plan.

M.M. filed a timely notice of appeal.

III.

DISCUSSION

M.M. contends that there is not substantial evidence to support the trial court's finding that the beneficial parent-child exception to adoption, identified in section 366.26,

7

subdivision (c)(1)(B)(i), did not apply in this case.  She contends that the evidence instead demonstrates that terminating her parental rights would be detrimental to C.M. Specifically, M.M. maintains that she has a parental relationship with C.M., they are bonded, and severing their attachment would be detrimental to him.

At a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child—adoption, guardianship or long-term foster care.  (*In re Taya C.* (1991) 2 Cal.App.4th 1, 7.)  If the child is found to be adoptable, there is a strong preference for adoption over alternative permanency plans.  (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888; *In re Zachary G*. (1999) 77 Cal.App.4th 799, 808-809.)

A finding of adoptability requires "clear and convincing evidence of the likelihood that adoption will be realized within a reasonable time." (*In re Zeth S*. (2003) 31 Cal.4th 396, 406; see § 366.26, subd. (c)(1).)   If the court finds that the child is likely to be adopted within a reasonable time, the juvenile court is required to terminate parental rights unless the parent shows by a preponderance of the evidence that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)(A) and (B). (*In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1343–1345.)

On review, we determine whether the record contains substantial evidence from which the juvenile court could find clear and convincing evidence that the child is likely to be adopted within a reasonable time. (*In re Gregory A*. (2005) 126 Cal.App.4th 1554, 1562; *Zeth S*., *supra*, 31 Cal.4th at p. 406.)  We must affirm the juvenile court's rejection

8

of any exception to termination of parental rights if the court's findings are supported by substantial evidence. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576 (*Autumn H*.).) We determine whether there is substantial evidence, contradicted or uncontradicted, to support the conclusions of the juvenile court, resolving all conflicts in favor of the prevailing party, and drawing all legitimate inferences to uphold the lower court's ruling. (*In re Brison C*. (2000) 81 Cal.App.4th 1373, 1378-1379.)

An appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. (E.g., *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) The substantial evidence standard of review is generally considered the most difficult standard of review to meet, as it should be, because it is not the function of the reviewing court to determine the facts. (See *Zeth S*., *supra*, 31 Cal.4th at p. 405.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The so-called "beneficial relationship exception" thus establishes a two-prong test requiring assessment of two criteria: (1) a parent's contact and visitation with the child, and (2) the benefit to the child of continuing the existing relationship.

The phrase "benefit from continuing the relationship" has been interpreted to mean "the [parent-child] relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.) "If severing the natural

parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid*., italics added.)[5]

To meet the burden of proof for the beneficial relationship exception, the parent must show more than frequent and loving contact or pleasant visits. (*In re Derek W*. (1999) 73 Cal.App.4th 823, 827 (*Derek W*.).) "Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The relationship arises from day-to-day interaction, companionship and shared experiences." (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. (*Ibid*.; *In re Elizabeth M*. (1997) 52 Cal.App.4th 318, 324.) And, again, the parent must demonstrate not only that the parent-child relationship promotes the well-being of the child, but that it does so "*to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents*." (*Autumn H*., *supra*, at p. 575, italics added.)

The trial court concluded that M.M. "made every effort to maintain regular visitation with the child and contact him." Although a number of circumstances prevented her contact with C.M. from being "ideal or perfect," the court concluded that M.M. had met the contact and visitation criteria. However, the trial court further

---

5      A substantial positive attachment from the child to the parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

10

concluded that the parent/child bond between M.M. and C.M. was not so strong from C.M.'s perspective that he would be greatly harmed if M.M.'s parental rights were terminated.  Rather, the court concluded, the benefits of adoption for C.M. outweighed the possible detriment that he might suffer if M.M.'s parental rights were terminated.  This finding is supported by substantial evidence.

As an initial matter, although the Agency suggests that M.M. "did not occupy a parental role in [C.M.'s] life," the trial court made no such specific finding, and we would disagree with the Agency's assertion, based on the record.  "The parent must do more than demonstrate 'frequent and loving contact[,]'  [citation] an emotional bond with the child, or that parent and child find their visits pleasant.  [Citation.]  Instead, the parent must show that he or she occupies a 'parental role' in the child's life.  [Citations.]"  (*Derek W., supra,* 73 Cal.App.4th at p. 827.)  Although M.M. was unable to provide C.M. with food, shelter and guidance on a daily basis as a result of her incarceration, it is clear that M.M. occupied a parental role in his life on a daily basis until he was six years old, and that even after that, C.M. viewed her as his mother, although he did not look to her to meet his daily needs.

However, even though M.M. may have occupied a parental role in C.M.'s life, there is substantial evidence to support the trial court's ultimate conclusion that the benefits to C.M. of adoption outweighed the possible detriment that he might experience as a result of the termination of M.M.'s parental rights.  The evidence demonstrated that although C.M. initially had a difficult time with his separation from M.M., in that he would isolate himself at school and would cry for his mother while on the playground,

11

C.M.'s difficulties waned as time progressed. In fact, not only did C.M.'s mood and self-isolation improve, he became active at school and began to thrive academically. C.M.'s improvement was so significant that he no longer needed an IEP, and he placed first in his class in a reading contest.

At the time of the selection and implementation hearing, C.M. had been out of his mother's care for almost two years, virtually one quarter of his life. During that period of time, he had no face-to-face contact with M.M., and had contact with her via the telephone only approximately two to four times per month. C.M. does not ask when he will be able to see his mother; rather, he has expressed a desire not to have face-to-face contact with her. In addition, C.M. does not become distressed upon the conclusion of his telephone calls with his mother.

There is evidence in the record that C.M. was looking forward to being adopted by his uncle. He has grown very close to his uncle, and has developed a strong and trusting bond with him. C.M. expressed that he is happy with his current situation and that he is being well taken care of.

All of this evidence is more than sufficient to support the trial court's conclusion that the parent-child relationship between C.M. and M.M. does not promote C.M.'s well-being to such a degree as to outweigh the well-being that C.M. would gain from being adopted by his maternal uncle.

IV.

DISPOSITION

The order terminating parental rights is affirmed.

_____
AARON, J.

WE CONCUR:

_____
BENKE, Acting P. J.

_____
NARES, J.

13