Filed 12/18/14  In re M.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re M.A. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D065790 |
| Plaintiff and Respondent, | (Super. Ct. No. J516164B-C) |
| v. | |
| CONNIE B. et al., | |
| Defendants and Appellants. | |

APPEALS from a judgment of the Superior Court of San Diego County, Carol Isackson, Judge.  Affirmed.

Clare M. Lemon, under appointment by the Court of Appeal, for Defendant and Appellant Connie B.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant Michael A.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Tahra C. Broderson, Deputy County Counsel, for Plaintiff and Respondent.

# I.

## INTRODUCTION

Connie B. and Michael A. appeal from the judgment terminating their parental rights to their son, M.A., and daughter, L.A. Connie and Michael contend that the trial court erred in declining to apply the beneficial relationship exception to termination of parental rights (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i))[1]. We affirm the judgment.

# II.

## FACTUAL AND PROCEDURAL BACKGROUND

A.     *General family background*

Connie and Michael are the parents of M.A. (now 5) and L.A (now 3). Connie first tried alcohol at age six, began smoking marijuana at age 17, and began using methamphetamine at age 20. Connie, who is now approximately 30 years old, reported using methamphetamine daily during a period of time while she was in her 20s.

Michael was convicted of a felony drug charge in 2004. In 2006, he was convicted of charges involving possession and sales of marijuana. He served a two-year prison term.

---

[1]     Unless otherwise stated, all subsequent statutory references are to the Welfare and Institutions Code.

In July 2005, a referral alleging that Connie was unable to care for M.A. and L.A.'s older sibling, K.Y.,[2] was substantiated after Connie was admitted to the hospital for abdominal pain and tested positive for marijuana, benzodiazepine, and methamphetamine. In early 2006, another referral regarding K.Y. was substantiated after she was left with an unsuitable caregiver. K.Y. became the subject of a dependency case. Connie was arrested for drug possession in May 2006. She did not contact the Agency regarding K.Y. for two months after her arrest. However, Connie received reunification services, was reunified with K.Y., and jurisdiction was terminated in May 2008.

After M.A. was born, another referral was generated in 2011 based on domestic violence between Connie and Michael in the presence of K.Y. and M.A. During the argument, Michael choked Connie and caused her to fall on M.A. K.Y. tried to call the police, but Michael grabbed the telephone away from her, and in the process, hit K.Y. in the face, leaving a welt. Michael was arrested as a result of this incident. Connie was offered voluntary services. She did not complete the services, and the voluntary case was closed as a failed case.

The current case involving M.A. and L.A. began with a February 2012 referral. M.A. was found wandering in the middle of the street, and the police were called. M.A. was able to tell the officer his name, but not where he lived. M.A. was taken to Polinsky Children's Center, where he was examined by a doctor. The doctor determined that M.A.

---

2    K.Y. is Connie's daughter by another man.

had "loop marks" on both legs, grab or pinch marks on both arms and a possible burn mark on his left forearm. These injuries were indicative of physical abuse.

Connie had called police to report M.A. missing. She was asleep in bed with M.A. in the morning, and when she woke up, she could not find him in the house. She initially thought that M.A.'s maternal uncle had come by to take M.A. out, but later learned that M.A. was not with the uncle.

Connie claimed that M.A. had sustained the injuries that an examining doctor at Polinsky Children's Center found by biting and scratching himself, and from falling down.

B.     *From the filing of the petitions and detention hearing through the six-month review hearing*

On March 2, 2012, the San Diego County Health and Human Services Agency (Agency) filed petitions alleging that the children were at substantial risk of serious physical harm under section 300, subdivisions (a) and (j) due to physical abuse to M.A., and that the substantial risk of serious physical harm or illness to L.A. was based on the abuse of her sibling.[3]

At a detention hearing, the court found Michael to be M.A.'s presumed father.[4] The court ordered that the children be detained in out-of-home care, and ordered supervised visits for both parents. L.A. was detained in a licensed foster home, and M.A.

---

[3]     The Agency also filed a petition with respect to K.Y., but she is not at issue in this appeal.

[4]     The Agency located a paternity declaration showing that Michael was L.A.'s presumed father.

was detained with paternal relatives. The children were later detained together with a paternal aunt.

A contested hearing was held in June 2012. The court found the allegations of the petitions to be true, removed the children from the custody of their mother, found that it would be detrimental to place the children with their father, and ordered that reunification services be provided. Michael had been in custody since the initial detention of the children and was still incarcerated at the time of this hearing.

Connie did not initiate reunification services until November 2012. From the time the children were initially detained in May, until November, she had not contacted the continuing services social worker. Connie also had not visited the children during this period of time.

Even after initiating visitation with the children in November 2012, on November 29, Connie missed a visit, claiming that she lacked transportation.[5] In December 2012, Connie missed an opportunity to see the children at an Incredible Families parenting program because she had not complied with the prerequisite of completing an assessment. The social worker expressed concern that Connie's "irresponsible behavior is causing further harm and detriment to the children." According to the social worker, the children would be excited to see Connie, but then, "when the mother does not follow through," her conduct would take an "emotional toll" on the children.

---

[5] Connie had been provided with bus tokens at an earlier point in time.

In July 2012, the social worker took M.A. and L.A. to visit Michael at the George Bailey Detention Facility. M.A. seemed confused about having to talk with his father through glass and using a telephone. M.A. expressed anger on the way home from the visit and seemed emotionally upset. In August 2012, the social worker took M.A. and K.Y. to visit Michael at the George Bailey Detention Facility. M.A. again appeared confused as to why he could not be in the same room as his father, and became upset at the conclusion of the meeting, stating that he did not want to leave. Michael was released from custody in October 2012.

Michael enrolled in the "Incredible Families" program in December 2012.[6] A therapist at the program suggested that L.A.'s visitation sessions at the Incredible Families program be limited to every other week because " 'having the baby there limits the father's ability to tend to [M.A.'s] needs.' " The therapist also reported that M.A. had been "physical" with the therapist during a visit.

After the January 9, 2013 contested six-month review hearing, the trial court terminated Connie's reunification services. The court found that she had not made substantive progress with the provisions of her case plan. The court ordered continued reunification services for Michael.

---

6    According to a letter attesting to Michael's enrollment in the program, "Incredible Families is a 15-week program that consists of a two hours weekly therapeutic monitored visit, a two hours weekly parenting class and individual counseling for children ages 2-11 as indicated."

C.      *From the six-month review hearing to the 12-month review hearing*

In January 2013, Connie gave birth to the children's younger sibling, J.A., who was also taken into protective custody by the Agency.

Between January and the end of April 2013, Connie did not stay in contact with anyone at the Agency and failed to visit with M.A. or L.A.

During this time, M.A., who was three years old, displayed behavioral problems that included hitting, pushing, and biting.  He presented as "physically aggressive towards other children including his two siblings."  M.A. also was observed putting "just about anything in his mouth," including dirt, rocks, and some items that could contain toxic materials, such as paint and pencils.  M.A. and the caregiver were participating in therapeutic services to try to address some of these issues.

L.A., who was one year old, was described as a generally happy child, but her caregiver noted concern that L.A. seemed willing to go into the arms of strangers easily.  According to the social worker, L.A. was bonded with her caregiver.

Michael continued to participate in reunification services.  He was described as "oppositional" with respect to a therapist's suggestions and teachings.  For example, when the therapist suggested that Michael not refer to three-year-old M.A. as "selfish" in front of M.A., Michael responded, " '[H]e is selfish.  I know how I talk to my children, [M.A.] knows what selfish is and that's just how I talk to him.' "  In addition, in a group parenting class setting, Michael stated, " '[W]e have our own way of raising our kids and you are trying to change us.' "  The therapist reported that Michael needed to improve his basic

7

parenting skills, including giving M.A. adequate attention, setting limits, and helping him interact positively with other children.

At the April 2013 12-month review hearing, the trial court ordered continued reunification services for Michael, given the finding that he had made "SOME progress" with the provisions of his case plan.

D.    *From the 12-month review hearing to the 18-month permanency hearing*

Between the 12-month review hearing and the 18-month permanency planning hearing, M.A. and L.A. remained in the home of their caregiver. A psychologist evaluated M.A.'s development and diagnosed him with disruptive behavior disorder, not otherwise specified. During a June 2013 evaluation, M.A. was observed to share many things with his caregiver, was respectful to her, and responded to her direction most of the time. M.A. and his caregiver were making progress in therapy, and the therapist noted a decrease in M.A.'s aggressive behaviors.

Michael tested positive for marijuana in June and July 2013. In addition, during this time period, Michael visited the children only sporadically, despite the fact that he had been told that he could visit any time at the caregiver's home, and the fact that he lived only two miles from the caregiver's home. In May, June, and July, Michael visited the children only once each month. According to paternal relatives, Michael sat on the couch and did not interact much when he visited the children.

Michael attended three Agency-supervised visits in July and August 2013. A supervisor observed Michael struggling to attend to the needs of the two children. At one visit, Michael allowed M.A. and L.A. to play by themselves while he sat on a couch.

8

Michael appeared to struggle with M.A.'s behavior as M.A. acted out to get Michael's attention. Michael threatened to put M.A. in time-out, but failed to follow through. At the end of the visit, however, M.A. cried.

At another visit, Michael sat on a couch and did not make any attempt to manage the children's behavior. When L.A. put a marker in her mouth, Michael did nothing. Rather than redirect M.A.'s behavior, Michael yelled at him. Michael threatened M.A. with taking toys away or a time-out, but again failed to follow through.

During this time period, Michael stated that he did not understand the reason for the Agency's involvement with the children. He asserted that when he was a child, children could play outside and cross the street, apparently in an attempt to address the fact that M.A. had been found wandering in the middle of the street alone. Michael's therapist reported that Michael sometimes viewed himself as "a victim of circumstances," and that he " 'acts as a victim' " rather than taking "full responsibility for his actions."

Michael was arrested for possession of marijuana and cocaine for sale, and transportation of marijuana, in August 2013. While in custody, Michael had a visit with both of the children in October 2013, and a visit with L.A. in November 2013. The children separated easily from Michael. Michael ended the November 2013 visit after approximately 15 minutes because L.A. was not interacting with him very much.

Connie attended supervised visits through the visitation center. These visits often included K.Y., as well as J.A. Although M.A. and L.A. appeared to enjoy spending time with Connie, and generally complied with her requests for shows of affection, Connie struggled to attend to the needs of all of the children at once. The children's behavior

often required the intervention of a visitation monitor. At the end of most visits, the children separated easily from Connie.

During one supervised visit, Connie washed baby bottles in the bathroom for approximately 20 minutes, leaving the children unattended. While Connie was gone, the children ran around, L.A. placed choking hazards in her mouth, and M.A. screamed in such a manner that a person from a nearby business came over to investigate what was going on. Connie had to be asked to return to the visitation room.

Additional issues arose at other visits. During one visit, Connie struggled to manage M.A.'s frequent behavioral outbursts during the final third of the 90-minute visit. At the end of the visit, Connie started crying, which in turn caused M.A. to cry, and eventually there was what was described as a "familial melt down." At other visits, the monitor had to intervene with respect to a safety issue involving one of the children.

By September 2013, the children's younger sibling, J.A., had been placed in Connie's care. But Connie continued to struggle to adequately supervise M.A., L.A., and J.A. at the same time. Connie's focus tended to be directed toward J.A., and she failed to notice safety issues with respect to L.A., in particular. A monitor suggested that Connie not bring J.A. with her to the visits with the other children so that she could spend more time with M.A. and L.A., but Connie was resistant to the suggestion.

By early October 2013, Connie was able to do a better job managing all of the children during visits, although the monitor believed that Connie still needed significant guidance. At an October 31, 2013 visit, Connie had a great deal of difficulty with the children. M.A. ran out of the building and into the parking lot. Older sibling K.Y., and

not Connie, went after him. Connie gave L.A. whole grapes, and failed to cut L.A.'s food into smaller pieces until after L.A. choked on one of the grapes.

At the conclusion of a contested November 2013 hearing, the court denied a section 388 petition that Connie had filed to seek placement and services. The court also terminated Michael's reunification services.

E.    *The post-reunification period*

Between November 2013 and April 2014, Connie continued to have supervised visits with the children at the visitation center. The children appeared to enjoy seeing their mother, referred to her as "Mommy," and generally exchanged affection with her at the beginning of visits. However, they rarely initiated affection during the visits, rarely went to Connie for comfort during visits, and gave no sign that they did not want the visits to end.

Connie continued to struggle with managing the children's behavior during visits. For example, at a November 2013 visit, the visitation monitor had to alert Connie that M.A. had a plastic knife. Connie threatened to stop visiting the children when they did not follow her directions. Connie sometimes failed to notice safety hazards for the children, including one occasion when L.A. put a marker cap in her mouth and the monitor had to intervene and remove it.

During visits between January and March 2014, the children were generally happy to see Connie and exchanged affection with her, but also separated easily. Although Connie made some progress in being able to manage her children's behavior in the

11

supervised setting, she still struggled.  Connie also discussed the caregiver and the case in the presence of the children.

In March 2014, a referral was generated on the children's younger sibling, J.A. The Agency learned that Connie had failed to pick up the baby when the daycare center that he was attending had closed during lunch time.  Connie was located in her room at her residential drug treatment program, and she appeared sick and disoriented.  She refused to retrieve J.A. from the daycare center, and also failed to pick him up when the daycare center closed for the day.

Although Connie claimed to have "self-discharged" from her residential treatment program, the program reported that in fact, she was asked to leave for failing to comply with program rules.  Connie had generated 29 incident reports prior to being asked to leave.

Michael remained in custody until December 2013.  During a Christmas week visit, Michael and M.A. exchanged affection, and Michael told the child that he was going into a drug rehabilitation program.  Both children separated easily at the end of the visit.

After Michael resumed visits with the children, the caregiver reported her concerns about M.A.'s behavior.  For example, M.A. misbehaved by ripping clothes, pulling down curtains, and making holes in walls.

As of February 2014, Michael had missed three visits at the visitation center, which caused the center to cancel his services.

On February 20, 2014, Michael was back in custody. He remained in custody through the contested section 366.26 hearing in April. Michael did not contact the social worker to ask for visits during this time.[7] Michael's attorney eventually requested that visits be arranged for Michael, and the social worker followed up to make arrangements. At the same time, the caregiver reported that M.A. had asked where his father was, and had been told that he was "out of town." M.A. said that he did not like to go to the prison because "bad people" were there. The caregiver also noted that Michael had not contacted her at all that year to inquire about the children.

F.     *The contested section 366.26 hearing*

At the initial section 366.26 hearing, the Agency recommended terminating parental rights and freeing the children for adoption. Both parents requested a trial. While waiting for trial, Connie filed a section 388 petition in which she requested that the children be placed with her.

At the contested hearing, the court considered the Agency's assessment report and addendum and the mother's section 388 petition and attachments.

Social worker Tuyen Ly recommended that the court terminate Connie and Michael's parental rights and free the children for adoption. She considered the children to be adoptable because they were young, attractive, and had met developmental milestones at appropriate ages.

---

[7]     The social worker accepted collect calls.

The children's caregiver wished to adopt them. She was not interested in a guardianship. She had initiated an adoptive home study.[8]

M.A. had resided with the caregiver for a few months when he was a toddler. In addition, after the petitions were filed, M.A. lived with the caregiver as of April 2012 and L.A. lived with her as of July 2012. The caregiver was willing to facilitate ongoing contact between the children and Connie and Michael. The caregiver was apparently an extended family member.

In addition to the caregiver, there were 23 other families with approved home studies in San Diego County that were interested in adopting a sibling set like M.A. and L.A.

Ly observed some of Connie's visits and reviewed the visitation logs. Connie never progressed beyond having supervised visits with M.A. and L.A. She failed to visit the children consistently in the beginning of their detention. Her visits were more regular in June 2013, and again in December 2013.

Ly acknowledged the positive attributes of Connie's visits. Connie had worked to improve her "parental role" with the children during the supervised visits. However, Connie had also made negative comments to L.A., made negative statements about the caregiver to the children, and talked to the children about the possibility of coming to her house. Connie had to be educated about giving the children too much sugar, which was

---

8    A referral had been generated on the caregiver's home after a marijuana-like odor had been detected in the area. The caregiver reported that a neighbor smoked marijuana. The referral was under investigation.

14

causing L.A. some health problems. Additionally, the children separated easily from Connie at the end of the visits.

Ly also reviewed Michael's visitation with the children. Although M.A. appeared to be sad about ending visits with Michael in July and August 2013, he did not exhibit any difficulty separating from Michael at more recent visits. Ly noted that Michael's recurring incarceration interfered with his ability to maintain contact and visitation with the children.

Ly stated that the children looked to their caregiver to fulfill their daily needs. They referred to the caregiver as "Mom." The children were thriving in the caregiver's home. M.A. and the caregiver were attending therapy, and it was going well. M.A.'s therapist reported that he wanted to stay with his caregiver and did not want to leave her home and live somewhere else.

Connie's section 388 petition alleged that she had J.A. in her care, she continued to participate in a drug treatment program, and she expected to enter a sober living home. Connie attached a therapy treatment update and visitation logs to her petition.

The trial court denied Connie's section 388 petition, concluding that she had failed to meet her burden to establish changed circumstances by a preponderance of the evidence. The court then terminated parental rights and freed the children for adoption. Connie and Michael filed timely notices of appeal.[9]

---

[9] Although Connie's notice of appeal references the trial court's denial of her section 388 petition, she makes no argument in briefing with respect to the court's ruling on that matter.

III.

DISCUSSION

Michael and Connie both contend that there is not substantial evidence to support the trial court's finding that the beneficial parent-child exception to adoption, identified in section 366.26, subdivision (c)(1)(B)(i), does not apply to either of them. Each parent contends that the evidence demonstrates that terminating his or her parental rights would be detrimental to the children.

A.    *Legal standards*

At a section 366.26 hearing, the court may select one of three alternative permanency plans for the dependent child—adoption, guardianship or long-term foster care. (*In re Taya C*. (1991) 2 Cal.App.4th 1, 7.) If the child is found to be adoptable, there is a strong preference for adoption over alternative permanency plans. (*San Diego County Dept. of Social Services v. Superior Court* (1996) 13 Cal.4th 882, 888; *In re Zachary G.* (1999) 77 Cal.App.4th 799, 808-809.)

If the court finds that a child is likely to be adopted within a reasonable time, the juvenile court is required to terminate parental rights unless the parent shows by a preponderance of the evidence that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1)(A) and (c)(1)(B). (*In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1343-1345.)

On review, we must affirm the juvenile court's rejection of any exception to termination of parental rights if the court's findings are supported by substantial evidence. (*In re Autumn H*. (1994) 27 Cal.App.4th 567, 576 (*Autumn H*.).) We determine whether

16

there is substantial evidence, contradicted or uncontradicted, to support the conclusions of the juvenile court, resolving all conflicts in favor of the prevailing party, and drawing all legitimate inferences to uphold the court's ruling. (*In re Brison C*. (2000) 81 Cal.App.4th 1373, 1378-1379.)

An appellate court does not reweigh the evidence, evaluate the credibility of witnesses or indulge in inferences contrary to the findings of the trial court. (E.g., *Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.) The substantial evidence standard of review is generally considered the most difficult standard of review for an appellant to meet because it is not the function of the reviewing court to determine the facts. (See *Zeth S.*, *supra*, 31 Cal.4th at p. 405.)

Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." The so-called "beneficial relationship exception" thus establishes a two-prong test that requires assessment of two criteria: (1) a parent's contact and visitation with the child, and (2) the benefit to the child of continuing the existing relationship.

The phrase "benefit from continuing the . . . relationship" has been interpreted to mean "the [parent-child] relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) "If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be *greatly harmed*, the preference for

17

adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*, italics added.)[10]

To meet the burden of proof for the beneficial relationship exception, the parent must show more than frequent and loving contact or pleasant visits. (*In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) "Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The relationship arises from day-to-day interaction, companionship and shared experiences." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive, emotional attachment from child to parent. (*Ibid.*; *In re Elizabeth M.* (1997) 52 Cal.App.4th 318, 324.) Whether the type of relationship exists that is sufficient to meet the beneficial relationship exception is determined by taking into consideration "[t]he age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs." (*Autumn H.*, *supra*, at p. 576.) And, again, the parent must demonstrate not only that the parent-child relationship promotes the well-being of the child, but that it does so "*to such a degree as to outweigh* the well-being the child would gain in a permanent home with new, adoptive parents." (*Id.* at p. 575, italics added.)

_____

10     A substantial positive attachment from the child to the parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

18

B.      *Substantial evidence supports the trial court's determination as to both parents*

    1.      *There is substantial evidence to support a finding that Connie did not meet the second prong of the beneficial relationship exception*

Even if we assume that Connie visited the children on a frequent, consistent basis,[11] the trial court's finding that the parent/child bond between Connie and M.A. and L.A. was not so strong from the children's perspective that either child would be greatly harmed if Connie's parental rights were terminated, is supported by substantial evidence. Specifically, substantial evidence supports the court's finding that the benefits of adoption for the children *outweigh* the possible detriment that they might suffer if Connie's parental rights were terminated.

Again, M.A. and L.A. were quite young when they were removed from their parents' care (two years old and three months old, respectively). By the time the contested section 366.26 hearing was held, the children had been out of Connie's care for approximately two years, virtually half of M.A.'s life, and almost all of L.A.'s life. Although the children referred to Connie as "Mommy" and seemed to enjoy spending time with her, there was also evidence that at times the children were reluctant to greet

---

[11]     M.A. was two and L.A. was three months of age when they were removed from Connie's care. Connie did not visit the children at all between May and November 2012. A period of more than four months is a significant period of time for children of such a young age. Further, there were reports by the caregiver that Connie did not contact the children between her supervised visits with them, and she did not ask to attend their medical appointments. It is therefore far from clear that Connie met the first prong of the exception, but for purposes of this appeal, we will assume that the evidence demonstrates that she did.

Connie at the beginning of visits. The evidence also demonstrated that the children separated easily from Connie at the end of the visits. Further, L.A. was described as a child who went easily to everyone, and did not specifically reserve her affection and positive reaction for Connie.

Connie often struggled to provide adequate physical care and supervision for the children, even in the supervised visitation setting. At times, M.A. and L.A. ran out of the visitation room. L.A. was at risk of choking on multiple occasions because food portions were too large or she placed nonfood items in her mouth, often without Connie noticing. During one visit, L.A. climbed onto a table. Visitation monitors reported that they had to intervene with the children on numerous occasions.

In addition, Connie failed to promote a positive emotional attachment with the children in various ways. For example, at times she threatened to stop visiting them. In addition, she would discuss the case in front of them, would speak negatively about the children's caregiver, and/or would fail to adequately regulate her own emotions, thereby upsetting the children.

Given these facts, it is clear that substantial evidence supports a conclusion that Connie did not fulfill a parental role in L.A. or M.A.'s life, in that neither child seemed to have a significant, positive, emotional attachment with her, and their relationship appeared to consist of little more than pleasant visits. However, even if a significant emotional attachment did exist such that one could find that Connie's parent-child relationship with either child promoted the well-being of that child, the evidence supports the trial court's conclusion that the benefits of adoption for these children simply

20

outweighed any potential detriment to them from terminating Connie's parental rights. The children have been with their caregiver for over two years, and are thriving in her care. The stability and sense of security that adoption will provide outweighs any benefit that the children might receive from maintaining the relationship with Connie.

To the extent that Connie attempts to rely on *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*) in support of her position that the trial court's finding with respect to the beneficial relationship exception is not supported by substantial evidence, her reliance is misplaced, since *S.B.* is clearly distinguishable. In *S.B.*, the father had been his three-year-old daughter's primary caregiver when she was removed from the home due to parental substance abuse. (*Id.* at p. 293.) After the child's removal, the father visited regularly, seeing his child up to three days a week. Not only did the father visit frequently, but he complied with every aspect of his case plan. (*Id.* at pp. 294-295.) For a year, the child was upset when visits with her father ended, and she consistently tried to leave with him at the conclusion of the visits. (*Id.* at p. 298.) The father made his daughter's needs a priority throughout the proceedings. Further, even after the court-mandated reunification services had been terminated, the father engaged in services on his own and continued his nurturing relationship with his daughter. (*Id.* at pp. 300-301.) During a bonding study, the child spontaneously told her father she loved him and wanted to live with him. (*Id.* at p. 295.) The psychologist who assessed the father-daughter relationship was of the opinion that there was a " 'fairly strong' " bond between the two. (*Id.* at pp. 295-296.)

21

This case presents significantly different facts from those in *S.B.* Unlike the father in *S.B.*, Connie failed to visit her children for significant periods of time. In addition, in contrast to the father in *S.B.* making his daughter's needs a priority, Connie displayed an inability to provide adequate physical and emotional care to her children, even within the confines of supervised visitation. Further, the children in this case separated easily from Connie at the end of visits. Finally, Connie presented no affirmative evidence to support the application of the exception, unlike the father in *S.B.*, *supra*, 164 Cal.App.4th at pages 295-296, who presented a bonding study, during which the daughter spontaneously told the father that she loved him.

2.      *There is substantial evidence to support a finding that Michael did not meet either prong of the beneficial relationship exception*

With respect to Michael, the trial court found that he had a "sporadic and episodic" relationship with the children, due to the fact that Michael had been "in and out of custody" during much of the time the children had been detained. To the extent the trial court was making a finding that Michael failed to demonstrate that he had maintained regular visitation and contact with the children, we conclude that such a finding is supported by substantial evidence.

Michael was in custody in March 2012, when the petitions in this case were filed and the children were initially detained. He was released approximately seven months later, in October 2012, and he visited with the children frequently for a period of time. However, as of the start of 2013, Michael's visitation with the children dropped off. He saw the children only approximately three times between January 2013 and August 2013,

22

even though he had been "reminded consistently that he could have visits anytime at the home of [the caregiver]." Michael then returned to custody as of August 2013, and he was released in December 2013. During this detention period, Michael called the caretaker's home on at least one occasion and spoke to M.A. about school. L.A. was too young to engage in a telephone conversation. An Agency staff person took the children to visit with Michael at the detention facility in October 2013. After his release in December 2013, Michael visited with the children during the week of Christmas. In January 2014, the caregiver ran into Michael at a taco shop and he told her that he was having medical issues and that was why he had not been visiting. Michael then started visits with the children at the Family Visitation Center on January 13, 2014. He had a visit on January 13, and another on January 27. On February 10, Michael was again arrested after violating the terms of his probation; his services at the Family Visitation Center were terminated as of February 11, after he missed three visits, at least two of which were to have occurred prior to his rearrest. During his detention after the February 10 arrest, Michael failed to contact the social worker about arranging visits with the children. His attorney made a request in late March 2014.

Irrespective of Michael's recurring incarceration, at a number of points during this process, Michael failed to maintain consistent visitation with the children or even make telephone contact with the children and/or their caregiver. There is thus substantial evidence to support a finding that Michael did not maintain regular contact and visitation with the children, such that he could meet the first prong of the beneficial relationship exception. We also conclude that there is substantial evidence to support the trial court's

23

finding that the children's relationship with Michael was not of a sufficiently beneficial nature as to outweigh the well-being the children would gain in a permanent home with new, adoptive parents.  (See *Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

Again, the children were very young when removed from their parents care, and Michael had been incarcerated even prior to the time the children were removed.  The children had spent nearly the entirety of their young lives being cared for by someone other than Michael.  With respect to L.A., the record demonstrates that although L.A. enjoyed spending time with Michael, he occupied the role of a friendly visitor in her life, not that of a parent.  During some visits, L.A. did not talk to Michael, and on at least one occasion, Michael decided to end the visit with her after 10 to 15 minutes because she was not talking.  Michael sometimes failed to properly supervise the children during visits that did not take place at the detention center, and failed to "notice safety concerns." L.A. separated easily from Michael at the end of their visits.  The record demonstrates that there is substantial evidence to support a finding that Michael's relationship with L.A. was not parental in nature, and the relationship did not "promote[] the well-being of [L.A.] to such a degree as to outweigh the well-being the child would gain in a permanent home with . . . adoptive parents."  (*Autumn H*., *supra*, 27 Cal.App.4th at p. 575.)

Although the evidence demonstrated that Michael had a relatively closer relationship with M.A. than he did with L.A., there was still abundant evidence to support the trial court's finding that the relationship between M.A. and Michael was not one that has resulted in a *significant*, positive, emotional attachment from child to parent.  For example, although M.A. would become upset at the conclusion of visits with Michael

24

early on, he had no trouble separating from Michael at the end of most visits, and had not been distressed about separating at the conclusion of visits since August 2013. In addition, Michael failed to inquire about M.A.'s general well-being or his therapy between visits. An Incredible Families therapist was of the opinion that Michael still needed to improve on basic parenting tasks, like attending to his children, setting limits, praising M.A., and modeling good behavior. During some visits, Michael would yell at M.A. At other visits, Michael would threaten to discipline M.A. but fail to follow through. There was also evidence that Michael would sit on the couch and fail to properly manage his children during the visits.

If adopted, the children would gain a sense of stability that Michael has been unable to provide, given his lack of consistent contact and his repeated incarcerations and failure to fulfill his probation obligations. Substantial evidence therefore supports a finding that Michael's relationship with M.A. was not as a parent caring for M.A. and meeting his needs for daily life, and that the relationship did not "promote[] the well-being of [M.A.] to such a degree as to outweigh the well-being the child would gain in a permanent home with [his] adoptive parents." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.)

To the extent that Michael contends that *S.B.*, *supra*, 164 Cal.App.4th 289 supports his contention that the trial court erred in terminating his parental rights, we reject such a contention. Unlike the father in *S.B.*, who complied with all of the requirements of his case plan, Michael continued to use drugs and violate the terms of his probation, resulting in recurring incarceration, throughout the entire dependency.

25

Further, there is no evidence that Michael has put the children's needs first. In addition, Michael has questioned the need for Agency and court involvement, and did not appear to understand the seriousness of the incident that led to the petitions being filed as to the children. Instead, Michael stated that when he was a child, kids could play outside—an apparent reference to two-year-old M.A. being found alone in the street. Further, the children separated easily from Michael as of August 2013, and Michael, like Connie, presented no affirmative evidence to support the application of the exception, whereas the father in *S.B.*, *supra*, 164 Cal.App.4th at pages 295-296 presented a bonding study demonstrating the strength of his relationship with his daughter.

In sum, there is substantial evidence to support the trial court's determination that the beneficial relationship exception to adoption did not apply to prevent the termination of Michael's parental rights to either M.A. or L.A.

IV.

DISPOSITION

The judgment is affirmed.

AARON, J.

WE CONCUR:

McCONNELL, P. J.

O'ROURKE, J.

26